REACTION MOLDING TECHNOLOGIES, INC. t/a Rim/Precision

v.

GENERAL ELECTRIC COMPANY.

Civ. A. No. 82–4970.

United States District Court,
E.D. Pennsylvania.

April 26, 1984.

---

See also, D.C., 588 F.Supp. 1280.

Arnold Borish, Philadelphia, Pa., for plaintiff.

Robert L. Archie, Jr., Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

### I. Procedural Posture

Plaintiff's complaint comprises three counts. In Count I, plaintiff alleges that plaintiff and defendant entered into a contract in 1982 whereby plaintiff agreed to construct four molds to be used by defendant to manufacture medical equipment and defendant agreed to pay plaintiff $259,100. Count I further alleges that defendant breached the contract by unilaterally terminating the agreement by letter dated May 7, 1982.

Count II alleges that two years before forming the contract alleged in Count I, plaintiff and defendant had entered into agreements in 1980 for plaintiff to construct molds that plaintiff would use to construct parts to be sold to defendant. The contract provided, according to the complaint, that if defendant desired to purchase the molds in addition to the parts, defendant would owe plaintiff an additional sum. The complaint alleges that defendant has demanded delivery of the molds, that plaintiff delivered the molds on October 12, 1982, but that defendant has not paid plaintiff the contract price.

Count III alleges that in April, 1982, plaintiff delivered to defendant certain parts for which defendant has not paid plaintiff.

Defendant filed an answer to the complaint and a counterclaim. The amended counterclaim, which does not bring up a new dispute but is merely an answer to plaintiff's Count I, alleges that plaintiff repudiated the 1982 contract and requests the court to order plaintiff to return the $86,368 deposit that defendant gave plaintiff for the production of the molds.

Defendant has moved for summary judgment on the issue of liability. Plaintiff has filed a cross motion seeking summary judgment on plaintiff's Counts I and III and on defendant's counterclaim. I will deny both motions.

## II. Facts

The script in this case is complex and the players numerous. Thus, before setting forth the facts, I have composed a chart of the actors appearing most frequently:

| Plaintiff-Reaction Molding | Defendant-General Electric |
|---|---|
| Wilton R. Danien, President | Jim Curtis, Waltz' boss |
| David E. Michaelis, Vice-President | Frank Waltz, GE Manager and boss to Repinski |
| Jeffrey W. Hill, plaintiff's representative in Chicago | Gregory A. Repinski, Project Manager CT9800 |
| Joseph E. Pompe, Tooling Supervisor | Lee Rundbaken, Roshak's boss |
| | Dick Brandt, GE Engineer |
| | Cletus R. Roshak, buyer for GE |
| | James Howard, buyer for GE before Roshak |
| | Wally Swanson, buyer for GE before Roshak |

The facts, when viewed in the light most favorable to the defendant are as follows: Reaction Molding Technologies (RIM) is a Pennsylvania corporation that produces plastic parts through a process known as reaction injection molding; its principal place of business is in Pennsylvania. RIM constructs the parts from molds. RIM subcontracts the manufacture of the molds to various subcontractors. General Electric is a New York corporation with its principal place of business in New York.[1]

1. I have diversity jurisdiction.

In 1979, General Electric (GE) began a project to develop a new computer known as the CT 9800 system. Gregory Repinski was appointed the project manager of the CT 9800 project. When GE began the project, Repinski was told by defendants' marketing department that the CT 9800 system must be completed by August, 1982 (Repinski deposition at 11–13). In late 1980, Repinski contacted plaintiff's sales representative, Jeffrey Hill, to see if RIM could supply GE with two parts required by the CT 9800 system, the "right hand cover" and the "left hand cover" (cover parts) (Repinski deposition 24–25). In early 1981, Howard, a GE buyer, requested that RIM submit quotes to GE for the cover parts and the molds to produce them (cover molds) (RIM exhibit 37). RIM submitted a quotation to GE on March 25, 1981. At the bottom of the quotation appeared the following:

Terms: Molds: one-third with order; one-third upon notification of mold completion; one-third upon approval of pre-production samples . . .

Parts: net tenth and twenty-fifth.

F.O.B.: Our plant

Delivery: Moldmakers delivery 22 weeks; preproduction samples to follow.

The words "terms," "F.O.B.," "our plant" and "delivery" were preprinted on the form. The remainder was typed (RIM exhibit 1(a)).

After defendant received the RIM quotation, GE engineers made numerous design changes which prevented GE from placing a purchase order for the cover molds with RIM throughout 1981 (Repinski deposition 37–38). As a result of these design changes, GE was lagging behind schedule for obtaining the cover parts (Repinski deposition 44–45, 53 RIM exhibit 2). Sometime in September of 1981, RIM representatives told Repinski that the lead time for the parts was twenty-six weeks (Repinski deposition 55).

In October, 1981, Wally Swanson, a GE buyer, requested new quotations for the

cover molds and parts and sought quotations for two additional parts for the CT 9800 system—a "small desk and a keyboard housing"—and for the molds to produce them (RIM exhibit 3, Danien affidavit ¶ 10). Despite the fact that Repinski had told Swanson that there were time pressures, the RIM parts underwent additional design changes, (Repinski deposition 58, 81), preventing RIM from providing the quotation requested in October, 1981 (Danien affidavit at ¶ 11). On February 23, 1982, Cletus Roshak, GE's then recently-hired buyer, sent RIM a written request for new quotations on the RIM molds and parts (Roshak deposition 94–96; RIM exhibit 6). Even before Roshak sent the request for quotations, he was aware that the delivery period for parts was of critical importance (Roshak deposition 33, 134).

On March 1, 1982, RIM sent its quotations for the small desk, keyboard housing and cover parts to Roshak at GE (RIM exhibits 1B, 1C, 1D and 1E). Typed at the bottom of each quotation next to the pre-printed word "terms" was the following:

Mold: One-third with order; one-third upon notification of mold completion; one-third upon approval of pre-production samples.

The delivery terms for the different parts differed according to the part.

For the small desk, the quotation stated: "Moldmaker's delivery approximately sixteen weeks; preproduction samples to follow." For the keyboard housing, the right cover arm and left cover arm the delivery terms were worded identically to those of the small desk except that the approximate number of weeks differed from the moldmaker's delivery. The approximate number of weeks for the moldmaker's delivery of those parts was twenty, twenty-two and twenty-two weeks respectively.

On March 2 or March 3, 1982, Roshak received the quotations. He understood that the basis on which RIM proposed to do business included a one-third deposit with the order and that the delivery terms were approximations (Roshak deposition 103–108). Roshak gave copies of the RIM quo-

tations to Repinski and Lee Rundbaken, Roshak's immediate boss (Roshak deposition 108–110; Rundbaken deposition 39).

GE requires approval of a written material requisition before ordering goods such as the RIM molds (Roshak deposition 43–47; RIM exhibit 5). Although the approval process, if expedited, could have been completed in a week, (Rundbaken deposition at 27), the approval process in this case began on March 3, 1982 and was not completed until March 22, 1982 (Roshak deposition 121–124).

On March 15, 1982, before the approval process was completed, Roshak received quotations for the same molds and parts from Polyform, a competitor of RIM. The quotations promised delivery of the parts faster than those of RIM and at a cheaper price, but GE rejected them because the material that Polyform planned to use was unacceptable (Roshak deposition 117–120; RIM exhibit 27).

Roshak prepared the GE purchase orders for the RIM molds on March 22, 1982. On the same day, Roshak called David Michaelis, vice-president of RIM, and told him that Roshak was ready to place a purchase order. Roshak asked Michaelis for a reasonable lead time because Roshak needed a number to punch into the GE computer system. Michaelis responded that Roshak could use the quoted lead time—22 weeks. Roshak took out the calendar and computed 22 weeks from March 22, 1982. The result was August 20, 1982. Roshak told Michaelis that he was putting August 20, 1982 on the purchase order but that he would like as much improvement on that date as possible. He told Michaelis that August 20, 1982 was not an acceptable date to GE (Roshak deposition 129–134).

Michaelis told Roshak that RIM expected a one-third down deposit with the order. Roshak told Michaelis that he could not send the deposit with the order, but he said that he would send the purchase orders via Federal Express. He requested Michaelis, upon receipt of the purchase orders, to send invoices for the deposit to Roshak. Michaelis agreed to send the invoices (Ros-

hak deposition 131). Roshak agreed to rush the check through the GE system after receipt of the invoice (Roshak deposition 135).

Despite the above conversation with Michaelis, the purchase orders that Roshak prepared after his discussion with Michaelis on March 22, 1982, contained the following words:

Terms: One-third with order
One-third mold completion
One-third upon approval and acceptance of samples.

(RIM 9(a) through (d)).

In the purchase orders, under the column entitled "Shipped to arrive at destination," Roshak had the date August 20, 1982 typed and wrote in longhand "or sooner" below the date. Additionally, at the bottom left hand corner preprinted in capital letters and bold-face type was the following:

Sign and return the attached acknowledgement promptly giving shipping date if different from above.

Each GE purchase order comprised two sections: The first page described above sets forth the items ordered, the price, the quantity and the delivery schedule. Page two is identical to the first page except that it serves as an acknowledgement to be returned by the seller to GE. At the bottom of the acknowledgement in capital bold-type face printing is the following:

This acknowledgement copy is part of our permanent record. Please furnish delivery date. Sign and return promptly.

The purpose of the acknowledgement copy is to allow the seller to highlight its differences with the terms set forth in the purchase order (Roshak deposition 52–53). RIM never executed the GE acknowledgement form, but rather sent its own acknowledgement form on March 26, 1982 and an accompanying letter written by Danien. The acknowledgement form for the cover parts states as follows:

Delivery: Approximately twenty-two weeks from receipt of one-third deposit. *Note:* We will accelerate delivery to every possible extent.

For the keyboard housing and small desk, the words "sixteen" and "twenty weeks" are substituted for "twenty-two weeks" respectively (RIM exhibit 10(a–d)). The accompanying letter objected to GE's requirement of biweekly progress reports and of the submission of mold drawings for approval by GE.

On April 14, 1982, Roshak responded by letter to Danien. The letter confirmed an agreement Roshak and Hill had reached regarding drawings and progress reports. The Roshak letter did not confirm his understanding concerning delivery even though the delivery terms on the RIM acknowledgments differed from those Roshak understood to be the agreement. Although the Roshak letter stated that RIM must have received the one-third deposit by that date, in fact, Roshak was mistaken. GE had not sent the one-third deposit.

On April 20, 1982, Michaelis called Roshak to inform him that RIM had not received the one-third deposit. He told Roshak that the moldmakers had not started construction of the molds and that if Michaelis did not obtain the check, the mold construction may be held up (Roshak 171–174).

RIM did not receive the one-third deposit check until April 26, 1982 (Danien affidavit ¶ 16). On that date, Roshak called Michaelis for confirmation that the check had arrived and to ask about delivery dates. Michaelis told Roshak that he would get back to him concerning the moldmakers' delivery (Roshak deposition 189–191).

On April 28, 1982, RIM sent its purchase orders for the RIM molds to Brockton Tool Company and Lawrence Mold and Tool Corporation. As required by the moldmakers, RIM included a one-third deposit with the purchase orders (Danien affidavit ¶ 17; RIM exhibit D–5(a)-(d)). On the same day, Danien suffered an injury at work which eventually caused him to lose three fingers. He was hospitalized until May 12, during which time Michaelis assumed many of Danien's duties (Danien affidavit ¶ 18).

On April 28, 1982 and April 29, 1982 Roshak called RIM, leaving messages for

Michaelis to return his call. On April 30, 1982, Michaelis returned Roshak's call. Roshak asked about delivery dates. Michaelis promised to have Joseph Pompe, who had been working on the dates, call Roshak back (Roshak deposition 194–196). Pompe telephoned Roshak the same day and told Roshak that RIM moldmakers had given him the following delivery dates for the molds: small desk mold—August 30, 1982; keyboard housing mold—September 13, 1982; left-hand cover mold—September 20, 1982; right-hand cover mold—October 25, 1982 (Roshak deposition 196–202; RIM exhibit 13).

These delivery dates expressed in numbers of weeks from RIM's receipt of the one-third deposit, are as follows: small desk mold—18 weeks; keyboard housing mold—20 weeks; left hand cover mold—22 weeks; right hand cover mold—26 weeks. Roshak told Pompe that he was surprised to hear of the dates because they were well in excess of the August 20, 1982 date (Roshak deposition 197). He further told Pompe that GE would like to have the parts at GE in mid-July and that the August 20, 1982 date was unacceptable (Roshak deposition 199–202).

During late April, Roshak had been advised by GE personnel that GE's shipping schedule for the CT 9800 system required that GE receive the RIM parts by mid-July, 1982 (Roshak deposition 285–287). Delivery of the molds to RIM had to precede RIM's manufacturing of the parts (Rundbaken deposition 78). The delivery terms of the RIM quotations and acknowledgements described the approximate lead time for the moldmakers' delivery of the molds to RIM, not delivery of the parts.

On May 6, 1982, Roshak prepared a report explaining from memory the April 30, 1982 phone conversation with Pompe to his superior Lee Rundbaken. The report states that Roshak "informed Pompe that these scheduled completion dates were unacceptable and that the parts were required in our plant in mid-July . . ." (RIM exhibit 16). The mid-July date was the only date

given by Roshak to RIM (Roshak deposition 287).

After the conversation between Pompe and Roshak, Pompe spoke to Michaelis and told him to speak with Roshak (Michaelis deposition 166–67). Michaelis and Roshak spoke again on April 30, 1982, the same day. Michaelis told Roshak that the dates Pompe gave Roshak were the best he could do and that GE should add two weeks for tryout of the molds (RIM exhibit 16).

During that same conversation, Roshak put Repinski on the line and Roshak, Repinski and Michaelis spoke in a three-way conversation. Roshak told Repinski the dates quoted by Michaelis. Repinski told Michaelis that those dates were unacceptable and that something would have to be done to improve them. Michaelis told GE that it could take or leave RIM's proposed delivery dates and accused GE of unprofessionalism and of delaying the project. He explained that the proposed delivery dates were late because GE had delayed in getting the one-third deposit check to RIM. By the end of the conversation, Michaelis had agreed to check with his moldmakers as to how much overtime costs would be and how much time working overtime would save the project (Roshak deposition 203–210).

After talking with Michaelis on April 30, 1982, Roshak spoke to a representative of Polyform by phone. Polyform's representative told Roshak that Polyform could have moldmakers' delivery of "spray metal" molds within fourteen weeks (Roshak deposition 212–214). These were the same type of molds that GE had found unacceptable when it rejected Polyform's original quotation of March 15, 1982 (Roshak deposition 214). The same day, at Repinski's direction, Roshak called Michaelis again and inquired how much GE would have to pay in cancellation charges if GE chose to cancel the agreement (Roshak deposition 213–216). Roshak requested the cancellation charge calculation for a meeting to be held at GE on Monday, May 3, 1982. Michaelis said it was impossible to get the figure to Roshak by the Monday meeting, but also

said that the cancellation charges would be very high.

Repinski, Roshak, Rundbaken, Frank Waltz, Repinski's boss, and others attended the meeting on May 3, 1982. At that meeting, there was unanimous agreement that the dates Pompe had given Roshak were unacceptable. The terms of RIM's acknowledgement forms were never discussed at the meeting (Roshak deposition 224–230). In fact, Repinski had never seen the acknowledgement forms at the time he recommended cancellation of the RIM order to Frank Waltz, the highest official who made the decision to cancel (Repinski deposition 159–160).

At the May 3 meeting, the persons present decided that they would attempt to visit RIM and RIM's moldmakers the following day to discuss how the delivery dates could be improved. In the event that these discussions were unsuccessful, the GE representatives would visit Polyform (Roshak 228–229).

After the May 3, 1982 meeting, Roshak called Michaelis and told him that the GE personnel planned to visit RIM the following day to speak with the moldmakers. Michaelis refused to allow the GE representatives to enter the premises to speak with the moldmakers. Furthermore, Michaelis refused to give Roshak the names and addresses of the moldmakers (Roshak deposition 232–235). During the conversation, Roshak handed the phone over to Rundbaken who spoke with Michaelis.

Because of experiences in which customer pressure on the moldmakers resulted in additional delay, Danien, the president of RIM, had established a policy of not allowing RIM customers to speak with or visit the moldmakers concerning delivery problems (Danien deposition at 172; affidavit ¶ 19).

After Rundbaken hung up with Michaelis on May 3, 1982, Rundbaken told Roshak that Roshak should visit Polyform the next day (Roshak deposition 238–239). Rundbaken also told Roshak that Michaelis "would have a reply on his moldmakers' schedule 5/4/82 A.M." (RIM exhibit 16).

On May 4, 1982, Waltz sent to GE personnel a memorandum concerning the CT 9800 project. The memorandum stated that to ensure the success of the project, materials for the CT 9800 should be available by May 31, 1982. It further stated that it was "very important" that materials be available before June 14, 1982 (RIM exhibit 14). Roshak was unaware of this memorandum until after he visited Polyform.

Roshak, Repinski and Dick Brandt, a GE engineer, visited Polyform on May 5, 1982 (Roshak deposition 244–247). At the time of the visit to Polyform, unaware of the schedule set forth in the Waltz memo, Roshak understood that the latest date on which GE needed the parts was the end of July (Roshak deposition 248).

Also, on May 5, 1982, Hill and Rundbaken met. Hill told Rundbaken that Michaelis was overwhelmed with the work since Danien's accident and asked that Hill serve as a liaison for any communications between GE and RIM. Hill also reported the excess costs that GE would have to pay in order to expedite delivery of the tooling (Rundbaken deposition 94–96).

On May 6, 1982, there was a conference call among Rundbaken, Roshak, Waltz and Jim Curtis, Waltz's boss. During the call, the participants decided to cancel GE's agreement with RIM and to contract with Polyform to produce the parts. The participants never discussed the possibility of purchasing prototype molding from RIM (Rundbaken deposition 106–108).

On May 7, 1982, Roshak called Hill to tell him that GE was cancelling the orders. Roshak asked for cancellation charges. He did not tell Hill that GE intended to enter an agreement with Polyform (Roshak deposition 280–281).

After the decision to cancel the GE–RIM agreement, Rundbaken met with lawyers from GE legal department on May 6 and May 7, 1982 to discuss language to be used in cancelling the agreement. On May 7, 1982 Rundbaken sent a telegram and con-

firmation letter to RIM cancelling its orders.

On May 10, 1982, after receiving the cancellation, Michaelis called Roshak to see if it would be possible to discuss GE's use of prototype molds in order to speed up delivery. Roshak refused to discuss the possibility. The following day, Roshak sent purchase orders to Polyform for prototype and permanent molds for production of the parts.

### III. Analysis of Section 2–207 of the Uniform Commercial Code

Defendant admits in ¶ 5 of its answer and counterclaim that a contract existed between RIM and GE. The two questions in this case are the delivery terms of the contract and whether GE was entitled to terminate the agreement.

In this classic "battle of the forms," in order to ascertain the terms of the agreement, it is necessary to determine, if possible, from which documents, words or actions of the parties the contract arose.

Because the contract involves a sale of goods, it is governed by the Uniform Commercial Code which has been adopted in Pennsylvania.

■ Section 2–207 applies. That section states:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms. ·

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

The purpose of this section is to avoid the rigidity of common law theory of contracts that requires an acceptance to be a mirror image of the offer. Because the common law concept was outdated insofar as it ignored the modern realities of the preprinted form and modern business practices, it tended to frustrate business purposes.

Therefore, the writers of § 2–207 sought to correct the common law inadequacies. Unfortunately, the section resulting from so noble a purpose is uniformly misunderstood and criticized for its obscurity. Referred to as "a murky bit of prose," and "like the amphibious tank that was originally designed to fight in the swamps, but was ultimately sent to fight in the desert," § 2–207 is a defiant, lurking demon patiently waiting to condemn its interpreters to the depths of despair. Nevertheless, § 2–207 must and can be conquered.

■ Section 2–207(1) covers two situations. First, it recognizes that a "definite and seasonable expression of acceptance" will be treated as an acceptance even though it states terms additional to or different from the offer. Secondly, it applies where the parties have reached an oral agreement and one or both parties send a written confirmation of the agreement. The written confirmation, in that instance, is considered an acceptance even though it states terms additional to or different from the oral agreement. This second application appears illogical because if an oral agreement has already been reached, there should be no need for an "acceptance." It

seems, however, that the primary purpose of the written confirmation rule is to allow parties to enforce contracts that would be unenforceable due to the statute of frauds.

Once an agreement has been found under § 2–207(1), § 2–207(2) provides the terms of the agreement. Under § 2–207(2), terms in an acceptance or confirmation that are additional to those in the offer or the oral agreement become part of a contract between merchants unless the document operating as an acceptance expressly limits acceptance to its terms; the additional terms materially alter the contract or notification of objection to the additional terms has been given or is given within a reasonable time after notice of the terms.

Courts and commentators diverge on the question of whether § 2–207(2) applies to different terms as well as to additional terms. Although § 2–207(1) mentions both different and additional terms, § 2–207(2) refers to additional terms only. Official comment 3, however, in explaining § 2–207(2) mentions both additional and different terms. Comment 3 states:

> Whether or not additional or different terms will become part of the agreement depends upon the provisions of subsection (2). If they are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party. If, however, they are changes which would not so change the bargain they will be incorporated unless notice of objection to them has already been given or is given within a reasonable time.

White and Summers seem to have split over the question whether § 2–207(2) applies to different, as well as to additional, terms. In Summers' view, at least, comment 3 goes beyond the text because § 2–207(2)(c) "would automatically eject the different term in the acceptance since 'notification of objection' would already have been given when the offeror included

the contrary term initially." J. White & R. Summers, *Uniform Commercial Code* 27 n. 7 (2d ed. 1980). *See also* R. Duesenberg & L. King, *Sales and Bulk Transfers Under the Uniform Commercial Code,* § 3.04[1], Vol. 3 (1982).

Anderson proposes that whether additional and different terms should be treated the same under § 2–207(2) depends on the facts of the particular case. If the trier of fact concludes that a "different" term is a flat rejection of the offer, the offer has been terminated by inclusion of a different term. Otherwise, suggests Anderson, different terms should be treated the same as additional terms under § 2–207(2).[2] R. Anderson, *Uniform Commercial Code* § 2–207:21 (3d ed. 1982).

If the documents do not form a contract, under § 2–207(1) i.e., if a document is not a "seasonable expression of acceptance" or a "written confirmation," of an oral agreement, § 2–207(2) does not apply.

Even though the documents between the parties do not create a contract under § 2–207(1), however, § 2–207(3) provides that there may be a contract if the parties' conduct recognizes the existence of a contract. Where the contract is based on conduct, and not on the writings of the parties, § 2–207(2) does not establish the terms of the contract, but rather, the terms consist of those terms on which the writings agree and any supplementary terms incorporated under other provisions of the act. Duesenberg & King, *supra,* at § 3.03[1].

In the present case, the parties dispute whether the contract was formed orally or by writings, and, if by writings, which writings. The question before me on cross motions for summary judgment is whether a genuine issue of material fact exists.

### IV. Defendant's Motion for Summary Judgment

■ Defendant makes two arguments in support of its motion for summary judg-

---

**2.** This proposal is problematic because if a term is so different that it acts as a rejection of the offer, the writing cannot be a "seasonable expression of acceptance" under § 2–207(1), and the trier of fact should not even be considering the terms of the contract under § 2–207(2) because the writings do not establish a contract.

ment. First, it claims that there was an oral contract between RIM and GE based on a phone conversation between Roshak and Michaelis that Roshak testified took place on March 22, 1982. Under this theory, the parties agreed that the delivery date was August 20, 1982 and the GE purchase order was merely a confirmation of that agreement under § 2–207(1). The record, when viewed in the light most favorable to plaintiff, does not confirm this theory. Genuine issues of material fact exist as to whether or not there was an oral contract. Michaelis testified that he could not remember whether he spoke with Roshak on March 22, 1982 (Michaelis deposition at 89). Roshak testified that on March 22, 1982 when he was preparing the GE purchase order he called Michaelis to ask for a reasonable lead time "because I had to have a number to punch in our system." He testified further that Michaelis told him to use the quoted lead time—22 weeks, that Roshak took the calendar out and computed 22 weeks from March 22, 1982, that the result was August 20, 1982, that he told Michaelis that the August 20, 1982 date was unsatisfactory and that he wanted an earlier delivery.

Roshak's testimony does not dispel all genuine issues of material fact. First, his testimony strongly implies that the only reason he asked for a date was so that he would have a number to process the purchase order. Furthermore, even if one were to assume that the testimony sets August 20, 1982 or sooner as the date agreed upon by Michaelis and Roshak, it is unclear whether that oral agreement refers to moldmakers' delivery of the molds to RIM or RIM's delivery of the parts to GE. The RIM quotation of approximately 22 weeks for lead time was for moldmakers' delivery of the molds to RIM and, if Michaelis told Roshak to take the quoted lead time, the trier of fact could reasonably find that Michaelis was referring to moldmakers' delivery. Delivery of the molds to RIM must precede the manufacture of the parts and, delivery of the parts would have to occur at a later date (Rundbaken deposition at 78).

Moreover, GE's purchase order or "confirmation" is inconsistent with the theory that the delivery date was fixed at August 20, 1982 or earlier. Although the date August 20, 1982 is typed under the delivery column and "or sooner" is written next to the date on the column, a statement which is preprinted below invites the receiver to change the delivery date. That statement says:

Sign and return the attached acknowledgement promptly giving shipping date if different from above.

Clearly, defendant is not entitled to summary judgment under the theory that there was an oral contract.

Defendant's second argument is that the GE purchase order was the offer and that plaintiff's acknowledgement form was a seasonable expression of acceptance under § 2–207(1). According to this argument, plaintiff's acknowledgement form contained a delivery term different from the purchase order. Assuming that § 2–207(2) applies only to additional terms, the delivery term would not become a part of the contract. Even assuming that § 2–207(2) applies to different, as well as additional terms, defendant argues that the term materially alters the contract and therefore, does not become part of the contract.

This argument has no merit. Generally, the first document to be sent is the offer. J. White & R. Summers, *Uniform Commercial Code* at 27. And, as in this case, "where the property to be sold is accurately defined and an amount stated as the price in a communication made, not by general advertisement, but to one person individually, no reasonable interpretation seems possible except that the writer offers to sell the property described for the price mentioned." *Williston on Contracts*, § 27 (3d ed. 1957).

RIM's quotations were the first documents sent. They were sent in response to a request from GE personnel. The quotations list the property, price, terms of payment and delivery terms. Therefore, no reasonable factfinder could find that the

purchase order, and not RIM's quotations, constitutes the offer. Thus, defendant is not entitled to summary judgment on this theory and I will deny its motion for summary judgment.[3]

## V. Plaintiff's Motion for Partial Summary Judgment

The complaint alleges a contract formed on April 20, 1982, the day plaintiff received the one-third deposit check from defendant. For the purposes of determining the delivery terms of the contract, plaintiff argues, it is not necessary to resort to § 2–207. Plaintiff's view is that GE's sending of the one-third deposit check to RIM was a manifestation of assent to the terms set forth in plaintiff's quotations, the defendant's purchase orders and the plaintiff's acknowledgement forms.

According to plaintiff, the terms in defendant's purchase order are not inconsistent. As noted above, the purchase order states that delivery will occur on August 20, 1982 or sooner, but it also states at the bottom of the purchase order that the receiver of the order could substitute its own dates for those typed into the delivery column. Plaintiff returned acknowledgement forms to GE after receiving GE's purchase order. One acknowledgement stated that delivery would occur "approximately 22 weeks from receipt of one-third deposit." The other acknowledgements were the same except that the number of weeks varied.

Defendant never objected to the delivery terms supplied by RIM in the acknowledgement forms. This reaction contrasted with defendant's treatment of other terms of GE's purchase orders to which RIM objected in its acknowledgements. Plaintiff argues that when GE sent its one-third deposit check to RIM, it manifested its assent to the delivery term contained in plaintiff's acknowledgement forms. Plaintiff's argu-

ment is based on *Argo Welded Products v. J.T. Ryerson Steel & Sons*, 528 F.Supp. 583 (E.D.Pa.1981). *Argo* involved the question of whether a signed delivery receipt constituted a manifestation of assent to the terms on the reverse side of the receipt. Relying on the concept that the party who signs a standard printed form agreement is bound by its terms absent countervailing public policy considerations, the court concluded that the party that signed the delivery receipt was deemed as a matter of law to have manifested its assent to the terms on the reverse side. *Argo* differed from the present case in two vital aspects. First, besides relying on the fact that the plaintiff signed the receipt, the court in *Argo* also noted that a course of prior dealing existed between the parties in which defendant had used the same standard printed delivery receipt. Second, in *Argo* the defendant signed a receipt the other side of which contained the term in dispute. Here, the fact that GE sent a deposit check could be construed as a manifestation of assent to the contract with RIM but not necessarily to the terms set forth in the quotation and acknowledgements. Furthermore, in this case, Roshak's deposition testimony has raised genuine issues of material fact as to the question of whether there was an oral agreement between the parties for delivery on August 20, 1982 or sooner. Therefore, I cannot find as a matter of law that GE assented to the delivery term contained in RIM's acknowledgement forms.

There are two possible scenarios at trial. As the factfinder in a nonjury trial, I could find that there was an oral contract which established a delivery date of August 20, 1982 or sooner.[4] In that event, I will turn to the question of whether defendant rightfully terminated the contract.

---

3. Defendant offered no evidence to support its motion for summary judgment on Count II. Consequently, I will deny the motion for summary judgment as to Count II as well as to Count I.

4. Because the defendant has admitted in its answer and counterclaim that a contract for sale of goods was made, there is no problem with the statute of frauds requirement. *See* § 2–201(3)(b).

■ If, on the other hand, I find that there was no oral contract establishing a delivery date of August 20, 1982 or sooner, I must turn to § 2–207. As a matter of law, I now conclude that defendant's purchase order was not a "seasonable expression of acceptance" under § 2–207(1). Defendant's purchase order states:

> Acceptance of this order is expressly limited to the conditions of purchase printed on reverse side.

Because this clause expressly conditions acceptance to the terms on the reverse side of defendant's purchase order, some of which are additional to or different from terms in plaintiff's offer, the writings of the parties do not rise to the level of a contract under § 2–207(1).[5] Even though the writings of the parties are insufficient to establish a contract, the conduct of the parties, including GE's sending of the deposit check to RIM and RIM's preparations and delivery of deposits to its moldmakers, is sufficient to establish a contract under § 2–207(3).[6]

The terms of the contract would be the terms on which the writings of the parties agree and any supplementary terms incorporated under any other provision of the Uniform Commercial Code.

In this case, because the parties' writings disagree on the delivery terms, the Uniform Commercial Code would supply delivery terms. Section 2–309(1) places the time for delivery, if not agreed upon by the parties, at "a reasonable time." Whether the delivery dates quoted by Pompe were reasonable or not would be a question of fact.

■ The second question at trial will be whether defendant had a right unilaterally to terminate the contract. If I find at trial that there was an oral contract formed on March 22, 1982 whose delivery term was August 20, 1982 or sooner for delivery of the RIM parts to GE, I will have additional questions of fact to consider. Roshak's testimony contradicts itself as to whether or not he required RIM to deliver the parts to GE by mid-July (Roshak deposition 199–202; 299; RIM exhibit 16). If I find as a fact that Roshak required RIM to deliver parts by mid-July and, if I find that the alleged oral contract did not contemplate delivery of the parts as early as mid-July, then defendant's insistence on delivery by mid-July and cancellation of the contract was a material breach of the contract, assuming that plaintiff can demonstrate that it was able to deliver by the date for which it had orally contracted.[7]

5. If this paragraph were not construed as an express conditioning of acceptance to the terms on the reverse side of the purchase order, the purchase order would be a seasonable expression of acceptance under § 2–207(1). The term "August 20, 1982 or sooner" would be a different term from the delivery term in plaintiff's offer. I agree with the Summers' approach that a different term does not fall under § 2–207(2) and would never become part of the contract. But, even assuming that § 2–207(2) covers different, as well as additional terms, there can be no question that RIM's acknowledgement objected to the term and, therefore, the GE term would not become part of the contract. In that instance, plaintiff's delivery term would govern.

6. Defendant has admitted in its pleadings that a contract existed. Furthermore, it is not necessary to ascertain the exact moment of formation of the contract. *See* § 2–204.

7. When viewing the facts in the light most favorable to the defendant, a reasonable factfinder could not find that plaintiff anticipatorily repudiated the contract as defendant argues.

Defendant relies on Michaelis' angry statement while under pressure that GE could "take it or leave it," referring to RIM's delivery schedule. A review of the entire discussion in which the comment took place and other discussions between GE and RIM employees before GE's decision to terminate the agreement cannot support GE's theory. On April 30, 1982, at the end of the three-way conversation among Michaelis, Roshak and Repinski, Michaelis agreed to check with his moldmakers about overtime costs and the time working overtime would save the project. On May 5, 1982, Hill met with Rundbaken, explained that Michaelis had been under pressure, asked that GE deal with Hill rather than Michaelis and reported the excess costs that GE would have to pay in order to expedite discovery. Furthermore, after receiving the cancellation letter and before GE entered into an agreement with Polyform, on May 10, Michaelis called Roshak to discuss the possibility of GE's use of prototype molds to speed up the delivery. It was GE, not RIM, that decided at this point to cancel the contract. Therefore, I conclude as a matter of law, that plaintiff did not anticipatorily repudiate the contract.

On the other hand, I, as factfinder, may find that there was no oral contract formed. In that event, having already concluded that there was no contract based on the writings of the parties, I would be governed by § 2–207(3). Because I now conclude as a matter of law that the conduct of the parties established a contract under § 2–207(3), the terms of the contract, absent a finding of an oral contract, are those upon which the writings of the parties agree and any other supplemental provisions of the UCC. The cancellation terms contained in RIM's quotations and acknowledgements and GE's purchase orders directly conflict with one another. Therefore, if I find that no oral contract with definite delivery and cancellation terms existed, it will be necessary to resort to § 2–610. That section states:

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may (a) for a commercially reasonable time await performance by the repudiating party; or (b) resort to any remedy for breach (§ 2–703 or § 2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and (c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's rights to identify goods to the contract notwithstanding breach or to salvage unfinished goods (§ 2–704).

Official comment 1 defines anticipatory repudiation as centering "upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance". Clearly, this section will allow RIM to recover damages from GE under § 2–703, the section containing seller's remedies, if at trial RIM can prove that there was no oral contract and that Pompe's delivery dates were reasonable dates.

Having concluded that there are genuine issues of material fact, I will deny defendant's motion for summary judgment and plaintiff's motion for partial summary judgment.