**DYNO CONSTRUCTION COMPANY, Plaintiff–Appellant,**

v.

**McWANE, INC., Defendant–Appellee.**

**No. 98–4050.**

United States Court of Appeals, Sixth Circuit.

Argued: Sept. 22, 1999

Decided and Filed: Dec. 20, 1999

Thomas P. Whelley II (argued and briefed), Scott L. Braum (briefed), Jack Kurt Denkewalter (briefed), Chernesky, Heyman & Kress, Dayton, Ohio, for Plaintiff–Appellant.

Joan C. Szuberla (argued and briefed), Byron S. Choka (briefed), Spengler Nathanson, Toledo, Ohio, for Defendant–Appellee.

Before: NELSON and SILER, Circuit Judges; QUIST, District Judge.*

## OPINION

QUIST, District Judge.

Plaintiff, Dyno Construction Company, sued Defendant, McWane, Inc., alleging various breach of contract claims arising out of Dyno's purchase of ductile iron pipe from McWane that was later found to be defective. The district court denied the parties' cross-motions for summary judgment, and a jury returned a general verdict in favor of McWane. The district court denied Dyno's motion for a new trial. Dyno appeals the order denying its motion for summary judgment, the judgment entered after trial, and the order denying Dyno's motion for a new trial. We find no error and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Dyno is a company engaged in the business of constructing underground utility projects, specifically underground water and sewer lines. Dyno was purchased in the fall of 1995 by Frederick Harrah, Laymond Lewis, and a third party. Prior to purchasing Dyno, Harrah and Lewis were employees of Reynolds, Inc., a large underground pipeline construction company also in the business of installing underground water and sewer lines.

McWane is a manufacturer and seller of ductile iron pipe and fittings for underground utility projects. Harrah and Lewis frequently purchased pipe from McWane during their employment with Reynolds, as McWane was the exclusive supplier of

* The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

certain types of ductile iron products to Reynolds.

Sometime shortly before November 6, 1995, Dyno submitted a bid to the City of Perrysburg, Ohio, for a multimillion dollar water and sewer system project. In order to prepare the bid, Lewis contacted various suppliers, including McWane, to obtain quotes for necessary materials. On November 6, 1995, Dyno learned that it was the low bidder on the project and would be awarded the contract.

On November 8, 1995, McWane's district sales manager, Kevin Ratcliffe, faxed Dyno a document containing quantities and prices for the materials Dyno requested for the Perrysburg Project.[1] Ratcliffe sent a second fax to Lewis on November 13, 1995, which included handwritten prices and notes next to each item. On the fax cover sheet, Ratcliffe asked Lewis to "[p]lease call."

On or prior to November 22, 1995, Lewis phoned Ratcliffe and told him to order the materials. Lewis testified at his deposition that he thought that there was a "done deal" when he got off the phone with Ratcliffe. However, after the phone call, Ratcliffe prepared and sent a package to Lewis via Federal Express. The Federal Express package included a purchase order, a credit application, and a cover letter in which Ratcliffe asked Lewis to review and sign the purchase order and credit application and return the originals to Ratcliffe. The purchase order and credit application each stated that the sale of the materials was subject to the terms and conditions printed on the reverse sides of those documents. The reverse side of each document contained additional terms and conditions, including a provision which limited McWane's liability for defective materials. The Federal Express invoice kept in McWane's files showed that Dyno received the package on November 24, 1995, at 8:53 a.m.

Lewis called Ratcliffe on December 1, 1995, to inquire about the status of Dyno's order. Lewis testified that Ratcliffe told him that "you have to sign our forms." Lewis indicated both in his deposition and at trial that he was not surprised when Ratcliffe told him that the purchase order and credit application would have to be signed before McWane would ship the materials. Lewis told Ratcliffe that he had not received the forms Ratcliffe sent via Federal Express and could not find the package in his office. At Lewis' request, in order to expedite the transaction, Ratcliffe faxed Lewis copies of the documents that were sent on November 22, 1995. However, Ratcliffe did not fax the back sides of the documents which included, among other things, this provision limiting McWane's liability:

SELLER SHALL NOT BE LIABLE FOR EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, CONSEQUENTIAL DAMAGES OR EXPENSES, INCLUDING BUT NOT LIMITED TO, LOSS PROFIT REVENUES, LOSS OF USE OF THE GOODS, OR ANY ASSOCIATED GOODS OR EQUIPMENT, DAMAGE TO PROPERTY OF BUYER, COST OF CAPITAL, COST OF SUBSTITUTE GOODS, DOWNTIME, LIQUIDATED DAMAGES, OR THE CLAIMS OF BUYER'S CUSTOMERS FOR ANY OF THE AFORESAID DAMAGES, OR FROM ANY OTHER CAUSE RELATING THERETO, AND SELLER'S LIABILITY HEREUNDER IN ANY CASE IS EXPRESSLY LIMITED TO THE REPLACEMENT (IN THE FORM ORIGINALLY SHIPPED) OF GOODS NOT COMPLYING WITH THIS AGREEMENT, OR, AT SELLER'S ELECTION, TO THE REPAYMENT OF, OR CREDITING BUYER WITH, AN AMOUNT EQUAL TO THE PURCHASE PRICE OF SUCH GOODS PRIOR PAID TO AND RECEIVED

---

1. Ratcliffe was actually the district sales manager for Clow Water Systems, Co., a division

of McWane. To avoid confusion, the Court will refer to the Clow division as McWane.

BY SELLER, WHETHER SUCH CLAIMS ARE FOR BREACH OF WARRANTY OR NEGLIGENCE....

Dyno signed the faxed pages without the quoted damages limitation provision and returned them to Ratcliffe later that day.

Dyno had substantial problems with the pipes it purchased from McWane. Although McWane repaired and reinstalled the pipe to the satisfaction of Dyno, it refused to pay Dyno for consequential damages suffered as a result of the defects in the pipes on the basis of the limitation of damages provision on the back of the purchase order. Dyno filed this suit in an attempt to recover its consequential damages.

Both parties moved for summary judgment with respect to the question of whether the quoted provision limiting McWane's liability for consequential damages was a part of the Dyno/McWane contract.[2] In denying the motions, the district court rejected Dyno's contention that the two written quotations which Ratcliffe sent to Lewis were offers that Dyno accepted when Lewis informed Ratcliffe that Dyno wished to purchase the pipe from McWane because the quotations were part of preliminary negotiations between the parties. Instead, the court concluded that the contract was formed or, alternatively, modified, when Lewis signed the documents he received from Ratcliffe by fax on December 1, 1995. The district court also rejected as a matter of law McWane's arguments that Dyno's acceptance of documents containing the warranty limitation provision established a course of performance and that a course of dealing was established by Lewis' dealings with McWane while Lewis was employed at Reynolds. Instead, the district court found that McWane's argument that Lewis had knowledge of the disputed provision

based upon his receipt of the Federal Express package presented a genuine issue of material fact. Thus, the district court framed the issue for the jury with respect to the limitation of damages provision as whether Lewis knew or should have known about McWane's terms and conditions at the time he signed the fax copy.

At trial, during the conference on jury instructions, the district court rejected Dyno's proposed instruction number 7, which would have allowed the jury to find that the contract had been formed on or before November 22, 1995, on the basis of its ruling with respect to the summary judgment motions that the contract was formed on December 1, 1995.[3] At the conclusion of trial, the jury returned a verdict in favor of McWane.

## II.  ANALYSIS

### A.  Summary Judgment

Dyno first contends that the district court erred when it found that the contract was formed on December 1, 1995, rather than on November 22, 1995. Although Dyno does not argue that the denial of its motion for summary judgment was erroneous, Dyno asserts that the determination made by the district court in ruling on the motion that the contract was made on December 1, 1995, when Lewis signed the fax documents, was erroneous.

Dyno asserted in its motion for summary judgment, and continues to argue to this Court, that the contract was actually entered into on November 22, 1995, when Lewis told Ratcliffe to go ahead and order the materials that Ratcliffe had listed in his November 8 and November 13 faxes. Dyno claims that the parties agreed to the essential terms of price, quantity, and description, and any other terms to the contract could be supplied by the "gap-filler"

---

**2.**  McWane also sought summary judgment on the issue of whether the pipe was defective.

**3.**  Judge James G. Carr, to whom the case was initially assigned, made the ruling on the par-

ties' cross motions for summary judgment. The case was then reassigned to Senior Judge John W. Potter, who conducted the trial.

provisions of the Uniform Commercial Code, which do not limit the seller's liability for consequential damages.

In order to prove the existence of a contract, a plaintiff is required to demonstrate the essential requirements of an offer, acceptance, and consideration. *See Helle v. Landmark, Inc.*, 15 Ohio App.3d 1, 8, 472 N.E.2d 765, 773 (1984). A valid and binding contract comes into existence when an offer is accepted. *See Realty Dev., Inc. v. Kosydar*, 322 N.E.2d 328, 332 (Ohio Ct.App.1974)(per curiam). Dyno contends that the written price quotations Ratcliffe faxed to Lewis on November 8, 1995, and November 13, 1995, constituted the offer, which Lewis accepted on behalf of Dyno on or about November 22, 1995, when Lewis told Ratcliffe to order the materials listed on the price quote.

■ "Typically, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract." *White Consol. Indus., Inc. v. McGill Mfg. Co.*, 165 F.3d 1185, 1190 (8th Cir.1999) (citing *Litton Microwave Cooking Prods. v. Leviton Mfg. Co.*, 15 F.3d 790, 794 (8th Cir.1994)); *see also Realty Dev., Inc.*, 322 N.E.2d at 332 (finding that the price quotation furnished to the appellant was "susceptible to the interpretation that [it] was nothing more than an invitation to appellant to make an offer"). Instead, a buyer's purchase agreement submitted in response to a price quotation is usually deemed the offer. *See Master Palletizer Sys., Inc. v. T.S. Ragsdale Co.*, 725 F.Supp. 1525, 1531 (D.Colo.1989). However, a price quotation may suffice for an offer if it is sufficiently detailed and it "reasonably appear[s] from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract." *Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc., of Illinois*, 635 F.Supp. 1281, 1284 (N.D.Ill.1986); *see also Master Palletizer Sys.*, 725 F.Supp. at 1531. While the inclusion of a description of the product, price, quantity, and terms of payment may indicate that the price

quotation is an offer rather than a mere invitation to negotiate, the determination of the issue depends primarily upon the intention of the person communicating the quotation as demonstrated by all of the surrounding facts and circumstances. *See Interstate Indus., Inc. v. Barclay Indus., Inc.*, 540 F.2d 868, 871 (7th Cir.1976) (quoting *R.E. Crummer & Co. v. Nuveen*, 147 F.2d 3, 5 (7th Cir.1945)); *Maurice Elec. Supply Co. v. Anderson Safeway Guard Rail Corp.*, 632 F.Supp. 1082, 1089 (D.D.C.1986)(mem.op.). Thus, to constitute an offer, a price quotation must "be made under circumstances evidencing the express or implied intent of the offeror that its acceptance shall constitute a binding contract." *Maurice Elec. Supply*, 632 F.Supp. at 1087.

In *Interstate Industries, Inc. v. Barclay Industries, Inc.*, 540 F.2d 868 (7th Cir. 1976), the court determined that a letter sent by the defendant to the plaintiff stating that the defendant would be able to manufacture fiberglass panels for the plaintiff pursuant to specified standards at certain prices did not constitute an offer. Among other things, the court found that the letter's use of the term "price quotation," lack of language indicating that an offer was being made, and absence of terms regarding quantity, time of delivery, or payment terms established that the letter was not intended as an offer. *See id.* at 873. *Thos. J. Sheehan Co. v. Crane Co.*, 418 F.2d 642 (8th Cir.1969), cited by the court in *Interstate Industries*, concluded that a price list for copper tubing which a supplier furnished to a subcontractor in connection with the latter's bid on a job was merely an invitation to engage in future negotiations. The court observed:

The only evidence of defendant's alleged September 1963 offer is the oral communication to plaintiff that Crane Company could supply copper for the Mansion House Project at a lower price than originally quoted. Reference was made to the new "Chase" price sheet concerning deliveries in minimum quantities of

5000 pounds or 5000 feet, and that prices for copper would be guaranteed for the "duration of the job." At this time nothing was stated by the defendant or plaintiff as to (1) the time in which plaintiff had to accept the "offer," (2) the quantity of copper tubing, fittings, or other supplies to be ordered, (3) the terms of payment or (4) the time when Crane Company promised to perform.

. . . The "Chase" price sheet was nothing more than a circular sent to distributors by the manufacturer, Wolverine. Without other terms of commitment, we find that the proposal as to "price protection" was related only to the quoted price as a condition upon which the supplier would be willing *in the future* to negotiate a contract of shipment.

. . . .

Prices and price factors quoted by suppliers to contractors for the purposes of aiding contractors to make bid estimates, without more specific terms, do not obligate the supplier to comply with any purchase order upon whatever terms and conditions the contractor may choose to offer at some undetermined date in the future. The fact that the prices quoted are not withdrawn or that a withdrawal of them is not communicated to the contractor is immaterial. No duty exists to revoke terms which without words of commitment merely quote an existing price at which a contract of purchase might be negotiated.

*Thos. J. Sheehan,* 418 F.2d at 645–46 (italics in original).

Similarly, in *Day v. Amax, Inc.,* 701 F.2d 1258 (8th Cir.1983), the Seventh Circuit affirmed the district court's grant of a directed verdict to the defendant on the issue of whether the defendant's description of mining equipment and a quotation of prices constituted an offer, reasoning that "[a]lthough questions of intent are usually for the jury to decide . . . the record discloses no evidence that any of the defendants manifested an intent to enter into a contract with [the plaintiff]." *Id.* at 1263. Thus, the plaintiff's evidence that the defendant had given the plaintiff signed writings containing detailed descriptions of the mining equipment and the terms of sale and had set up an escrow account were insufficient to demonstrate the defendant's intent to enter into a contract. *See id.* at 1264–65; *accord Maurice Elec. Supply,* 632 F.Supp. at 1088 (concluding that the defendant's price quote "was simply a statement of price for three individual high mast poles of varying height" because "[i]t did not specify quality or quantity, time and place of delivery, or terms of payment" and "[t]here was no promise that the quote would remain open for a specified period of time").

In contrast to the cases discussed above, the court in *Bergquist Co. v. Sunroc Corp.,* 777 F.Supp. 1236 (E.D.Pa.1991), found that the question of whether the price quotation at issue constituted an offer was a question of fact for the jury. Some of the factors cited by the court as creating an issue for the jury were: (i) the price quotation was developed by the defendant after the parties had engaged in substantial negotiations; (ii) the quotation included a description of the product, a list of various quantities at various prices, terms of payment, and delivery terms; (iii) the quotation contained the statement "This quotation is offered for your acceptance within 30 days"; and (iv) the price which the purchaser paid was the price listed in the price quotation rather than the price listed in the purchaser's subsequent purchase order. *See id.* at 1249.

In this case, the facts before the district court furnished a sufficient basis for it to conclude as a matter of law that the contract was formed when Lewis signed the fax from Ratcliffe on December 1, 1995, rather than when Lewis told Ratcliffe to order the materials on November 22, 1995. In particular, neither the November 8 nor the November 13 price quotations contained words indicating that

Ratcliffe intended to make an offer to Dyno. The word "Estimate" was printed at the top of the document faxed on November 8, and the message "Please call" was printed on the cover sheet for the document faxed on November 13. These words are indicative of an invitation to engage in future negotiations rather than an offer to enter into a contract. Although both price lists set forth descriptions of the materials, prices, and quantities, nothing was stated about the place of delivery, time of performance, or terms of payment. *See Litton Microwave Cooking Prods.*, 15 F.3d at 795 (rejecting the contention that the defendant's price letters and catalogs, which failed to address the place of delivery, quantities, and availability of parts to be purchased were not offers). Finally, the fact that Lewis voluntarily signed the December 1 fax demonstrated that he understood that a binding contract had not been formed as a result of the previous price quotations sent by Ratcliffe. In light of these facts, we agree with the district court that McWane's price quotations did not constitute offers and that the contract was formed on December 1, 1995.[4]

### B. *Motion for New Trial*

■ Dyno also contends that the trial court erred in denying its motion for a new trial. Dyno argued to the district court that it was entitled to a new trial because the district court made several erroneous rulings on evidentiary issues and jury instructions. Motions for a new trial are addressed to the sound discretion of the trial court. *See Hopkins v. Coen*, 431 F.2d 1055, 1059 (6th Cir.1970). We review a district court's denial of a motion for a new trial under an abuse of discretion standard. *See Holmes v. City of Massillon*, 78 F.3d

1041, 1045 (6th Cir.1996). An abuse of discretion occurs when this Court has "a definite and firm conviction that the trial court committed a clear error in judgment." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir.1989).

### 1. *Evidentiary Issues*

Dyno first argues that the district court erred in allowing testimony concerning Lewis' familiarity with McWane's standard purchase order, including its terms and conditions, based on Lewis' prior dealings with McWane as an employee of Reynolds. Dyno argues that Lewis' prior dealings with McWane as an employee of Reynolds are completely irrelevant to the issue of whether the contract between Dyno and McWane included a limitation of liability provision and that this evidence confused the jury and caused prejudicial error.

■ We agree with the district court that the evidence about Lewis' prior dealings with McWane, particularly as it related to Lewis' knowledge of McWane's standard terms and conditions, was relevant and properly admitted. The faxed copy of the purchase order signed by Lewis on December 1, 1995, stated on the front in large print directly above his signature that the purchase order was subject to the terms and conditions on the reverse side. There is no disputing that McWane intended those terms and conditions on the back of the purchase order to be part of the contract but that Ratcliffe inadvertently failed to fax the back of the purchase order to Lewis. Therefore, Lewis' knowledge of those terms or his knowledge that McWane used standard terms and conditions in its sales, based on his

---

4. The cases cited by Dyno, *Reaction Molding Technologies, Inc. v. General Electric Co.*, 585 F.Supp. 1097 (E.D.Pa.1984), and *Loranger Plastics Corp. v. Incoe Corp.*, 670 F.Supp. 145 (W.D.Pa.1987), are both distinguishable from the instant case on their facts. In Reaction Molding Technologies, the quotations contained payment and delivery terms and thus were substantially more detailed than the

price quotations at issue in this case. *See Reaction Molding Tech.*, 585 F.Supp. at 1099. In *Loranger Plastics*, the quotation stated that it was "subject to acceptance without modification within 30 days" from the date it was issued. *See Loranger Plastics*, 670 F.Supp. at 146. The language in the quotation therefore indicated that it was intended as an offer.

prior dealings with McWane, was particularly relevant to whether those terms and conditions became part of the contract. The jury could properly determine whether Lewis knew or should have known about the limitation of liability in McWane's standard terms and conditions, and therefore intended that the limitation of liability be part of the contract.

■ Dyno next contends that the district court abused its discretion and committed prejudicial error when it refused to admit Lewis' testimony that McWane had waived its limitation of liability for consequential damages on several occasions in its dealings with Reynolds while Lewis was an employee of that company. Dyno contends that if Lewis' prior dealings with McWane as an employee of Reynolds were relevant, McWane's waiver of its limitation of liability clause for Reynolds was also relevant.

We agree with the decision to exclude this evidence because its admission would have likely caused jury confusion. The issue for the jury was whether McWane's standard terms and conditions were part of the contract, not whether those terms and conditions would be enforced. Had the district court admitted the evidence, McWane would have been entitled to explore the circumstances under which consequential damages were allegedly paid and explain why those circumstances were different from those at issue in the case. The whole foray into the issue, which was collateral to the actual issues at trial, would have caused substantial prejudice to McWane. Furthermore, McWane's terms and conditions stated that any waiver of a right by McWane in a particular instance would not constitute a future waiver of that right.

Dyno's final evidentiary argument is that the district court erred in admitting Federal Express delivery records generated from Federal Express' computer system. McWane sought to lay the foundation for introduction of these records under the business records exception to the hearsay rule through the testimony of Fred Jacobs, the Operations Manager at the Federal Express office in Wauseon, Ohio. Jacobs explained that he was fully familiar with Federal Express' system for moving and tracking packages and testified that these records were generated and kept in the regular course of business by Federal Express in its centralized computer system in Memphis, Tennessee.

Dyno objected to the admission of the records, arguing that the records were not under Jacobs' "custody or control" because: (1) he was not responsible for the geographic area in Ohio where the package was shipped; and (2) the computer records were printed in Memphis. Dyno contends that because these records were not under Jacobs' custody or control, Jacobs could not lay a proper foundation for introduction of the records and they are therefore inadmissible as hearsay.

Federal Rule of Evidence 803(6) provides that the following evidence is not excluded by the hearsay rule:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness....

Fed.R.Evid. 803(6).

■ While Dyno is correct that Jacobs could not lay a foundation for introduction of the Federal Express records under Rule 803(6) as a "custodian" of the records, Jacobs would be a proper witness to lay a foundation as an "other qualified witness" as described in the Rule. To be

an "other qualified witness," it is not necessary that the person laying the foundation for the introduction of the business record have personal knowledge of their preparation. *See United States v. Franks*, 939 F.2d 600, 602–03 (8th Cir.1991) (rejecting the defendant's contention that the district court erred in admitting Federal Express records on the basis that the witness laying the foundation was unable to determine which employees prepared delivery records and airbills). All that is required of the witness is that he or she be familiar with the record-keeping procedures of the organization. *See United States v. Wables*, 731 F.2d 440, 449 (7th Cir.1984)(stating that "[i]t is clear that, in admitting documents under the business records exception to the hearsay rule, 'the testimony of the custodian or otherwise qualified witness who can explain the record-keeping of his organization is ordinarily essential' ")(quoting 4 Weinstein, Evidence ¶ 803(6)[02] (1981)); *NLRB v. First Termite Control Co.*, 646 F.2d 424, 427 (9th Cir.1981)(noting that through the custodian or "other qualified witness" requirement, Rule 803(6) "insures the presence of some individual at trial who can testify to the methods of keeping the information"). Thus, in *United States v. Hathaway*, 798 F.2d 902 (6th Cir.1986), we stated that "[w]hen a witness is used to lay the foundation for admitting records under Rule 803(6), all that is required is that the witness be familiar with the record keeping system." *Hathaway*, 798 F.2d at 906. In that case, we rejected the defendant's contention that the government could not lay a foundation through the testimony of an FBI agent for the admission of records seized from the defendant's business offices under the business records exception. We found "no reason why a proper foundation for application of Rule 803(6) cannot be laid, in part or in whole, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted." *Id.* at 906; *see also Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1150 (7th Cir.1989) (noting that

a person qualified to lay the foundation under Rule 803(6) need not even be an employee of the entity keeping the records, as long as the witness understands the system by which they are made).

Jacobs testified in depth about his understanding of Federal Express' system for delivering and tracking documents, as well as its system for central storage of its voluminous computerized records in Memphis. That Jacobs was not involved in the preparation of the documents or that he did not know who prepared them were not matters that precluded the admission of the documents as business records. Therefore, the district court did not abuse its discretion in admitting the Federal Express records.

Furthermore, there was other evidence from which the jury could have concluded that Dyno received the Federal Express package by December 1, 1995. For instance, McWane also introduced into evidence a copy of a Federal Express invoice kept in its files as a business record, for which there is no dispute that a proper foundation was laid for admission at trial under the business records exception, through the testimony of its custodian, Ratcliffe. The invoice showed that Dyno received the package on November 24, 1995, at 8:53 a.m. Accordingly, there was sufficient evidence for the jury to find that Dyno was or should have been aware of McWane's terms and conditions, including its limitation of liability, at the time it signed the faxed purchase order on December 1, 1995.

### 2. *Jury Instructions*

■ Dyno argues that the district court committed reversible error in refusing to give two of its proposed jury instructions. Jury instructions in civil cases are reviewed "as a whole to determine whether they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision. A judgment on a jury

verdict may be vacated when the instructions, viewed as a whole, were confusing, misleading and prejudicial." *Jones v. Consolidated Rail Corp.*, 800 F.2d 590, 592 (6th Cir.1986) (citation omitted).

Dyno first argues that the district court committed reversible error in refusing to give Dyno's proposed jury instruction number seven, which would have allowed the jury to find that the contract was formed on November 22, 1995, when Lewis told Ratcliffe by telephone to go ahead and order the materials. Because this Court has already affirmed the district court's conclusion that the contract was formed on December 1, 1995, when Lewis signed the document faxed by Ratcliffe, it would have been improper for the district court to instruct the jury that it could find that the contract was formed on November 22, 1995. Accordingly, the district court properly rejected Dyno's proposed instruction.

■■■ Dyno's final argument is that the district court committed reversible error in not giving its proposed instruction number twelve, which read:

> McWane must show that the agent designated to receive such information as Federal Express packages actually received and had knowledge of the contents of the package before Dyno is deemed to have knowledge of the disputed terms.

We believe that this instruction is an erroneous statement of the law and would have placed an unwarranted burden on McWane at trial. The evidence presented at trial was sufficient to allow the jury to find that the Federal Express documents had been delivered to an authorized agent of Dyno because the Federal Express documents were actually located in Dyno's job file for the Perrysburg project and contained Lewis' handwriting at the top of the documents. In addition, McWane's evidence showed that the documents were actually delivered to Dyno's offices on November 24, 1995. Moreover, McWane could demonstrate that Dyno had received and had knowledge of the contents of the package even if the "agent designated to receive such information" did not actually receive and have knowledge of the contents of the package. For example, if some agent of Dyno other than the "agent designated to receive such information" received the package, that knowledge could be imputed to Dyno. There was also evidence that Lewis had knowledge of the contents of the package, in that he had previous knowledge about McWane's credit application and terms and conditions, even though he testified that he never received the package. This instruction thus ignored other means by which McWane could have demonstrated Dyno's knowledge of McWane's terms and conditions and would have placed an unreasonable burden on McWane to prove actual receipt and review of the documents by the specified Dyno agent. That burden would have been extremely difficult to meet because no one at McWane specifically observed Dyno's handling and receipt of the November 22 documents. Thus, the failure to give this instruction does not render the instructions, "viewed as a whole, [ ] confusing, misleading and prejudicial...." *Jones*, 800 F.2d at 592.

Therefore, Dyno was not entitled to a new trial.

### III. *CONCLUSION*

For the foregoing reasons, the judgment of the district court is AFFIRMED.