RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0165P (6th Cir.)
File Name: 01a0165p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
  _Plaintiff-Appellee,_

  _v._

LUIS SALGADO (99-5645);
WILFREDO JAMBU (99-5651),
  _Defendants-Appellants._

Nos. 99-5645/5651

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 98-00067—Charles R. Simpson, III, Chief District
Judge.

Argued: September 19, 2000

Decided and Filed: May 18, 2001

Before: BATCHELDER and COLE, Circuit Judges;
GRAHAM, District Judge.

---

*The Honorable James L. Graham, United States District Judge for
the Southern District of Ohio, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:** William Yesowitch, BARBER, BANASZYNSKI & ASSOCIATES, Louisville, Kentucky, Michael M. Losavio, Louisville, Kentucky, for Appellants. Alexander T. Taft, Jr., ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** William Yesowitch, BARBER, BANASZYNSKI & ASSOCIATES, Louisville, Kentucky, Michael M. Losavio, Louisville, Kentucky, for Appellants. Alexander T. Taft, Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee.

GRAHAM, D. J., delivered the opinion of the court, in which BATCHELDER, J., joined. COLE, J. (pp. 32-33), delivered a separate concurring opinion.

_____

**OPINION**

_____

GRAHAM, District Judge. Appellants Luis Salgado (Case No. 99-5645) and Wilfredo Jambu (Case No. 99-5651) were named along with two other defendants, Francisco Portuondo-Gonzalez and Daniel Rosalez, in a two-count indictment filed on June 1, 1998 in the Western District of Kentucky. Count 1 of the indictment alleged a conspiracy on or about May 1, 1998, to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846. Count 2 of the indictment charged the defendants with possessing with intent to distribute five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1).

The case against Salgado and Jambu was tried before a jury, and on January 29, 1999, the jury returned a verdict of guilty on both counts against both defendants. A sentencing hearing was held on May 3, 1999, and the appellants were

sentenced to a term of incarceration of 121 months. The appellants now assert several claims of error on appeal.

*I. Facts of the Case*

The evidence presented at trial, including the testimony of co-defendant Daniel Rosalez, reveals that Francisco Portuondo-Gonzalez was a distributor of cocaine in the Louisville, Kentucky area.  His source of cocaine was Eduardo Garcia, a resident of Miami, Florida.  Portuondo-Gonzalez and Garcia used Garcia's silver Mustang to transport cocaine from Florida to Louisville in April of 1998. Portuondo-Gonzalez and Garcia would drive the car to Florida and pick up the cocaine, then Portuondo-Gonzalez would fly back to Louisville, and Garcia would drive the Mustang back with the cocaine concealed under a bumper cover.

Shy Heath, a Louisville distributor of cocaine, purchased cocaine from Portuondo-Gonzalez.  Portuondo-Gonzalez, who spoke little English, enlisted the services of Rosalez to act as an interpreter.  On or about April 26, 1998, Shy Heath purchased approximately two-and-a-half kilograms of cocaine from Portuondo-Gonzalez.  After the sale on April 26, 1998, Portuondo-Gonzalez left for Florida to obtain more cocaine, but his house was broken into and both Portuondo-Gonzalez and Garcia flew back to Louisville.  Rosalez overheard a conversation between Portuondo-Gonzalez and Garcia indicating that Luis Salgado, also known as "Wicho," was going to be driving the Mustang loaded with the cocaine to Louisville that week.

Heath was arrested shortly after the purchase of cocaine on April 26, 1998, and agreed to act as an informant.  He agreed to make several monitored telephone calls to Portuondo-Gonzalez.  During the week of April 26, 1998, Heath spoke with Rosalez about purchasing additional cocaine from Portuondo-Gonzalez. Portuondo-Gonzalez informed Rosalez that he would have seven kilograms of cocaine.  Heath later called Portuondo-Gonzalez and requested five kilograms of cocaine.  Portuondo-Gonzalez told him the cocaine would

arrive on Friday. Heath negotiated with Portuondo-Gonzalez for the sale of five kilograms of cocaine at a price of $22,000 per kilogram, scheduling the transaction for 9:00 p.m. on Friday, May 1, 1998.

Telephone toll records revealed that calls were placed between Salgado's cell phone and Portuondo-Gonzalez's phone on April 26, 29 and 30, 1998, and on May 1, 1998. Calls were also placed from a phone registered to Jambu to Salgado's cell phone on April 29 and 30, 1998, and on May 1, 1998.

Salgado arrived in Louisville on May 1, 1998. Telephone records revealed that a phone call was made on Salgado's cell phone to the telephone of Portuondo-Gonzalez at approximately 1:25 p.m. Portuondo-Gonzalez left his residence located on Patterson Drive in his Camry at approximately 1:29 p.m. and drove to a Shoney's Restaurant in the area of Fern Valley Road and I-65, near the location of the Tanglewood Apartments on Bermuda Lane where Wilfredo Jambu resided. Salgado drove to a restaurant where he traded cars with Portuondo-Gonzalez, then proceeded in Portuondo-Gonzalez's Camry to the Patterson Drive residence.

Salgado was seen in the company of Jambu at approximately 5:01 p.m. at the Patterson Drive address. At approximately 7:57 p.m., Jambu left the Patterson Drive residence with two women and a child and proceeded to his residence on Bermuda Lane. Portuondo-Gonzalez, Salgado and Rosalez remained at the Patterson Drive residence. At approximately 8:20 p.m., Salgado was observed talking on a phone, and at approximately 8:23 p.m., Jambu left his apartment on Bermuda Lane and was seen arriving at the Patterson Drive address at approximately 8:30 p.m. The surveillance officer observed Jambu open the trunk of his car, look to the right and to the left, then proceed to the front of the house. He appeared to be carrying something in his right hand.

1991), where, on facts very similar to those presented here, the court held that the insertion and turning of a key in the defendant's apartment door lock to determine whether the key fit constituted a search for Fourth Amendment purposes. *See id.* at 1172. The court went on to conclude, however, that such search did not violate the Fourth Amendment because the defendant's privacy interest in the keyhole was minimal. *See id.* at 1173. The same is true here. The Fourth Amendment's historic protection of the privacy of the home suggests that, on different facts, the same investigative technique at issue here might require a showing of probable cause or a warrant; *on these facts*, however, Jambu's privacy interest in his door lock was so minimal that the officer's conduct cannot be said to have been unreasonable, and thus did not violate the Fourth Amendment. I write separately, therefore, because I believe that the Court need not reach as broad a holding as it does.

---

**CONCURRENCE**

---

R. GUY COLE, JR., Circuit Judge, concurring. Although I concur in the Court's decision affirming the judgment of the district court, I write separately to register my disagreement with the Court's analysis of the admissibility of police testimony relating to an officer's insertion of a key into the lock on Defendant-Jambu's apartment door. Specifically, I do not agree with the majority's conclusion in Part VI of its opinion that the officer's use of the key for identification purposes was not a search.

The majority relies too heavily on our decision in *United States v. Debardeleben*, 740 F.2d 440 (6th Cir. 1984), where we held that the insertion of a key into the lock of a car door for the purposes of ascertaining the car owner's identity was not a search. *See id.* at 445. Our decision in *Debardeleben* merely reflects our long-standing view that, for Fourth Amendment purposes, individuals are entitled to a lesser degree of privacy in their cars than in their homes. *See United States v. McClellan*, No. 93-4084, 1994 WL 589497, at *4 (6th Cir. Oct. 25, 1994) (unpublished) ("The courts have traditionally interpreted the Fourth Amendment to allow law enforcement officers greater leeway when conducting warrantless searches inside vehicles than they enjoy when searching homes . . . ."). In this instance, the officer's turning of the key in the lock to Jambu's apartment door encroaches on the "zone of privacy" held most sacrosanct under the Fourth Amendment. *See Smith v. Stone*, No. 99-3208, 2000 WL 687672, at *4 (6th Cir. May 19, 2000) (unpublished) ("[T]he Fourth Amendment protects an individual's privacy in many different settings, but '[i]n none is the zone of privacy more clearly defined than when bounded by the unambiguous dimensions of an individual's home.'") (quoting *Payton v. New York*, 445 U.S. 573, 589 (1980)).

I would adopt the reasoning set forth by the Seventh Circuit in *United States v. Concepcion*, 942 F.2d 1170 (7th Cir.

According to Rosalez, Jambu entered the house through the door from the garage into the kitchen and delivered a brown paper grocery store bag. Jambu stated to Portuondo-Gonzalez, "I brought the shit" (meaning the cocaine) and said "I'll call you later." Jambu left at 8:34 p.m. and returned to his apartment on Bermuda Lane. Within the next half-hour, Rosalez was looking out the garage door toward the patio area, which extended to the fence, and observed a figure walking toward the fence. At approximately 8:55 p.m., Portuondo-Gonzalez was seen by the surveillance officer walking from the rear of the yard along the fence line.

A search warrant was executed on the Patterson Drive residence at approximately 9:15 p.m. on May 1, 1998. Portuondo-Gonzalez was found holding the wrappings from the five kilograms of cocaine. The wrapping consisted of plastic wrap, dryer sheets and duct tape. Proceeding to the area along the fence where Portuondo-Gonzalez had been seen earlier, officers found a brown paper bag which had been placed inside a blue plastic bag. A drug dog alerted to the package, which was found to contain five kilogram bricks of suspected cocaine. The cocaine was subsequently analyzed and was found to be 5,011 grams of eighty-three percent pure cocaine.

During the search, phone calls were placed from the phone at Jambu's apartment to Salgado's cell phone. Jambu and Portuondo-Gonzalez's wife left the Bermuda Road apartment and drove in the direction of the Patterson Drive address, but were stopped and arrested.

On May 1, 1998, the police located the silver Mustang in the parking lot of the Tanglewood Apartments. A drug dog alerted to the left rear quarter panel where it met the bumper. A search of the Mustang revealed that the vehicle, which was purchased by Garcia on April 8, 1998, in Tampa, Florida with sixteen miles on it, had 8,881 miles on the odometer. A key found in the car fit the lock of Jambu's apartment door.

At the time of his arrest on May 1, 1998, Salgado gave a statement to the police. He gave a Miami, Florida, address

and provided his cell phone number. He stated that he had come to Louisville to visit a cousin, Jambu's girlfriend. He stated he thought the car he had driven from Florida was a rental car, but he did not remember what kind of car it was, who gave him the car or where the car was. He stated he arrived in Louisville at approximately 1:30 or 2:00 p.m. and received a phone call from Portuondo-Gonzalez, who gave him directions to a restaurant. He gave the car to Portuondo-Gonzalez at the restaurant and drove to Portuondo-Gonzalez's residence in his Camry.

## II. Sufficiency of the Evidence

Salgado and Jambu assert that the evidence at trial was insufficient to sustain their convictions for conspiracy and possession with the intent to distribute cocaine, and that the trial court erred in denying their motions for a judgment of acquittal. Our review of the denial of a motion for acquittal is *de novo*. *United States v. Wuliger*, 981 F.2d 1497, 1509 (6th Cir. 1992), *cert. denied*, 510 U.S. 1191 (1994).

"[A] defendant claiming insufficiency of the evidence bears a heavy burden." *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998), *cert. denied*, 525 U.S. 1184 (1999). In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt. *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir.), *cert. denied*, 516 U.S. 926 (1995).

In assessing the sufficiency of the evidence, "we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir.), *cert. denied*, 512 U.S. 1243 (1994). In reviewing a defendant's claim of insufficiency, we draw all available inferences and resolve all

In this case, the sentencing judge clearly indicated that he believed that he had the authority to depart downward on the basis of Salgado's alien status, but that he was declining to do so in this case. The trial court stated, "I am going to refuse to do it under these facts. I'm not holding that I can't. I'm holding that I'm not going to here under the facts that he has in this case." Jt. App. p. 475. Where, as here, the trial court affirmatively states on the record that alien status can provide a basis for departure, but declines to do so under the circumstances of the particular case, such awareness of the discretionary power to depart precludes our review of the sentencing judge's decision not to grant a downward departure. *See United States v. Farrow*, 198 F.3d 179, 200 (6th Cir. 1999).[7]

## VIII. Conclusion

In accordance with the foregoing, the judgments of the trial court in the cases of Luis Salgado and Wilfredo Jambu are hereby AFFIRMED.

---

[7]There is a split of authority on the issue of whether a defendant's status as a deportable alien is a proper basis for a downward departure. *Compare United States v. Veloza*, 83 F.3d 380, 382 (11th Cir. 1996); *United States v. Mendoza-Lopez*, 7 F.3d 1483, 1487 (10th Cir. 1993); *United States v. Nnanna*, 7 F.3d 420, 422 (5th Cir. 1993); *and United States v. Restrepo*, 999 F.2d 640, 645-47 (2d Cir. 1993)(deportable alien status not a proper basis for departing downward), *with United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997); *United States v. Smith*, 27 F.3d 649, 654-55 (D.C.Cir. 1994)(deportable alien status may be considered for a downward departure). This court has considered the question only in the context of a defendant charged with an offense which could be committed only by aliens, and concluded that in such a case, the Sentencing Commission had already taken alien status into consideration in determining the guideline range. *See Ebolum*, 72 F.3d at 38. Here, we do not reach the issue of whether departure based on alien status may apply to other types of offenses since we have determined that the trial court's decision is not appealable. *See Farrow*, 198 F.3d at 199.

information that he has." The court further stated that "there are just so many missing pieces that I believe Mr. Salgado has knowledge of that his abbreviated statements are simply not enough to get him this fifth element in the safety valve.... [H]is statements do not appear to be fulsome to this court." *Id.* p. 473.

Where the government challenges a defendant's claim of complete and timely disclosure and the defendant does not produce evidence that demonstrates such disclosure, a district court's denial of a request to apply § 3553(f) and § 5C1.2(5) is not clearly erroneous. *Adu*, 82 F.3d at 125. Here, the trial court did not commit clear error in concluding that Salgado failed to provide the government with "a completely forthright account of his own involvement" in the offense. *Id.* The trial court properly decided that § 5C1.2 was not applicable.

## C. Denial of Downward Departure Due to Alien Status

Salgado also seeks to appeal the finding of the district court that he was not entitled to a downward departure due to his alien status. Salgado argued below that due to the fact that he was a Cuban national who cannot currently be deported due to the lack of diplomatic relations between Cuba and the United States, he might be held indefinitely in the custody of the Immigration and Naturalization Service upon his release from prison.

The refusal of a district judge to make a downward departure is ordinarily not appealable. *United States v. Byrd*, 53 F.3d 144, 145 (6th Cir. 1995). A decision denying a downward departure may be appealed only where the trial court's refusal to depart was based on the erroneous belief that it lacked the authority to do so. *United States v. Landers*, 39 F.3d 643, 649 (6th Cir. 1994). Thus, in *United States v. Ebolum*, 72 F.3d 35 (6th Cir. 1995), we reviewed the trial court's decision declining a downward departure based on defendant's status as a deportable alien where the court indicated on the record that he believed he lacked the authority to depart.

issues of credibility in favor of the jury's verdict. *Maliszewski*, 161 F.3d at 1006.

In order to establish the offense of conspiracy under 21 U.S.C. § 846 alleged in Count 1 of the indictment, the government had to prove: (1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy. *United States v. Welch*, 97 F.3d 142, 148-49 (6th Cir. 1996). The government is not required to prove that a formal agreement existed. *United States v. Avery*, 128 F.3d 966, 970 (6th Cir. 1997). The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan. *Avery*, 128 F.3d at 971. An intent to distribute the cocaine may be inferred from the large quantity and purity of the cocaine. *See United States v. White*, 932 F.2d 588, 590 (6th Cir. 1991).

Although mere presence at the crime scene is insufficient to show participation, a defendant's participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances. *Maliszewski*, 161 F.3d at 1006 (citing *United States v. Hernandez*, 31 F.3d 354, 358 (6th Cir.), *cert. denied*, 513 U.S. 912 (1994)). While an agreement must be shown beyond a reasonable doubt, the connection between the defendant and the conspiracy need only be slight, and the government is only required to prove that the defendant was a party to the general conspiratorial agreement. *Id.*

The evidence relied on by the government to prove the conspiracy offense is basically the same evidence relied upon to prove the possession charge. To establish the charge of possession with intent to distribute illegal drugs under 21 U.S.C. § 841(a)(1) in Count 2 of the indictment, the government had to prove that: (1) the defendant knowingly; (2) possessed a controlled substance; (3) with intent to distribute. *Jackson*, 55 F.3d at 1225. To prove that a defendant aided and abetted the possession with intent to distribute a controlled substance, the government must

establish that the defendant participated in the venture as something he wished to bring about and sought to make succeed. *United States v. Ward*, 190 F.3d 483, 487 (6th Cir. 1999).

A rational trier of fact could find from the evidence presented at trial that an agreement to possess with the intent to distribute cocaine existed and that Portuondo-Gonzalez, Garcia, Rosalez, Salgado and Jambu knowingly participated in that conspiracy. The intent to distribute the cocaine was shown by the large quantity and purity of the cocaine involved and by the fact that once the cocaine was transported to Louisville by Salgado, arrangements were quickly made to sell five kilograms to Heath.

The jury could reasonably find from the evidence that Salgado knew about and intended to join the drug conspiracy run by Portuondo-Gonzalez and Garcia, that he knowingly participated in the conspiracy, and that he aided in the possession of the cocaine with the intent to facilitate its distribution. Rosalez provided evidence of a conversation between Portuondo-Gonzalez and Garcia to the effect that Salgado was the person who was driving the silver Mustang containing the cocaine from Florida on May 1, 1998. The jury could conclude from this evidence that Salgado participated in the conspiracy and aided in the possession of the cocaine by transporting the cocaine from Florida.

The jury could infer that Salgado knew he was delivering cocaine from his evasive statements to the police regarding who gave him the car and the make of the car, and from the fact that he met first with Portuondo-Gonzales despite his statement that he came to Louisville to visit his cousin. *See Jackson*, 55 F.3d at 1226 (jury could infer consciousness of guilt from drug courier's implausible story); *United States v. Mari*, 47 F.3d 782, 785 & n. 2 (6th Cir.)(evidence of suspicious circumstances surrounding defendant's trip and defendant's inconsistent testimony supported conclusion that defendant fabricated story to hide actual purpose of transporting drugs), *cert. denied*, 515 U.S. 1166 (1995).

defendant is required to provide complete information regarding not only the offense of conviction, but also any relevant conduct, including disclosure of information regarding the participation of other people in the offense. *United States v. Maduka*, 104 F.3d 891, 894 (6th Cir. 1997). The trial court's refusal to apply § 5C1.2 is a factual finding which we review for clear error. *Adu*, 82 F.3d at 124.

At sentencing, Salgado relied on a statement which he made to officers on the date of his arrest. The government disputed the defendant's entitlement to the application of § 5C1.2 on the basis of that statement, arguing that some of Salgado's statements to the police were not truthful. Counsel for the government stated at the sentencing hearing that Salgado told the authorities that he left from Miami, Florida, but that later the defense claimed that he left from Tampa. Government counsel further argued that Salgado's statements that he drove a rental car from Florida (despite evidence to the contrary that he drove Garcia's Mustang), that he did not recall the make or model of the vehicle which he had driven for 1,200 miles, the person who gave him the car, or the restaurant where he met Portuondo-Gonzales, and that he did not know where the rental vehicle could be located, were not credible.

Salgado took the position that he is not guilty of the offenses in this case. He contends that he was not required to meet the criteria for acceptance of responsibility under U.S.S.G. 3E1.1 in order to benefit from the "safety valve" provision, citing *United States v. Real-Hernandez*, 90 F.3d 356, 361 (9th Cir. 1996). However, the court in that case noted that, while a defendant need not meet the requirements for acceptance of responsibility, "he must truthfully supply details of his own culpability." *Id*. Here, there is no evidence that Salgado did so; in fact, the record supports the government's position that Salgado did not provide a complete statement of his knowledge of the offense.

The trial court concluded at the sentencing hearing that "I cannot find that Mr. Salgado has truthfully provided all

extent of Salgado's involvement in the five kilogram sale was not less culpable than that of the other participants in the transaction. Thus, Salgado is not a minor participant. Likewise, the record fails to show that Salgado played only a single, limited role in the transaction, or that he lacked knowledge or understanding of the scope of the transaction, so as to qualify him as a minimal participant. Salgado has not shown by a preponderance of the evidence that he was entitled to a mitigating role adjustment.

## B. Denial of "Safety Valve" Reduction

Salgado also challenges the trial court's decision finding that his case did not warrant the application of the so-called "safety valve" provision found in 18 U.S.C. § 3553(f), as incorporated into U.S.S.G. § 5C1.2. Under this provision, a defendant who is found by the court to meet the criteria set forth in 18 U.S.C. § 3553(f)(1)-(5) is sentenced within the guideline range applicable to his case even if that range falls below an otherwise mandatory statutory minimum sentence. In this case, the trial court found that the defendant did not meet the requirement found in 18 U.S.C. § 3553(f)(5), which provides that

> not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f)(5); *see also* U.S.S.G. § 5C1.2(5).

The defendant, as the party seeking a downward departure, has the burden of proving by a preponderance of the evidence that he is entitled to the "safety valve" reduction. *United States v. Adu*, 82 F.3d 119, 123-24 (6th Cir. 1996). The

Additional evidence connected Salgado to the conspiracy. Telephone toll records revealed several calls between Salgado's phone and those of Jambu and Portuondo-Gonzalez shortly before and on the day that the sale of cocaine to Heath was to occur. Salgado met with Portuondo-Gonzales to exchange vehicles at a restaurant near Jambu's apartment shortly after Salgado's arrival in Louisville, and the Mustang was later found in the parking lot of Jambu's apartment complex. It would be reasonable for the jury to infer that the exchange was made to facilitate the unloading of the cocaine. Salgado was also present at the residence on Patterson Drive at the scheduled time of the sale of cocaine to Heath. He was seen using a phone shortly before Jambu left his apartment and proceeded to the Patterson Drive address to deliver the package containing the cocaine. The evidence is sufficient to support Salgado's convictions for conspiracy and possession with the intent to distribute cocaine.

A rational trier of fact could also reasonably find from the evidence that Jambu was a member of the conspiracy, that he knowingly participated in it, and that he aided in the possession of cocaine with the intent that it be distributed. Shortly before the sale was to occur at 9:00 p.m., Jambu was seen taking two women and a child from the Patterson Drive residence and transporting them to his apartment on Bermuda Lane, leaving Portuondo-Gonzalez, Salgado and Rosalez at the residence. The jury could reasonably infer that he did this to ensure that the women and child were not present in the house during the transaction.

Soon after Salgado was observed talking on the phone, Jambu left his apartment and proceeded back to the Patterson Drive address at approximately 8:30 p.m. He opened the trunk of his car, looked to his left and to his right, and appeared to carry something into the house. According to Rosalez, Jambu brought a package into the kitchen, and stated, "I brought the shit," referring to the cocaine. Within the next half-hour, Rosalez observed a figure walking toward the fence in the back yard, and at 8:55 p.m., Portuondo-Gonzalez was seen by the surveillance officer walking from

the rear of the yard along the fence line. The cocaine was discovered in this area, and the wrappings from the cocaine were found in the kitchen. The jury could reasonably find from these circumstances that Jambu brought the cocaine to the residence.

Telephone toll records revealed several calls prior to and on the day of the scheduled sale of cocaine from Jambu's phone to Salgado's cell phone. The execution of the search warrant at Patterson Drive commenced at 9:15 p.m. Two phone calls made from Jambu's phone at 9:25 and 9:28 went unanswered. At some point shortly after the commencement of the search, Jambu was seen leaving the apartment at Bermuda Lane driving in the direction of the Patterson Drive address. He was pulled over by the police at 9:45 p.m. The jury could reasonably infer that Jambu, concerned about the lack of an answer to his phone calls and fearing that something had gone wrong with the sale, decided to go the Patterson Drive residence to investigate. The silver Mustang used to transport the cocaine was found in the parking lot of Jambu's apartment complex. A drug dog alerted on the car. A key fitting the door of Jambu's apartment was found in the car.

Jambu notes that the drug dog did not alert to his Buick. However, the dog's handler testified that his dog would not be able to detect the odor from cocaine placed in a fresh brown paper bag which was in the trunk for a period of seven to ten minutes, the amount of time it took Jambu to travel from his apartment to Portuondo-Gonzalez's residence. Jambu further argues that the testimony of Rosalez concerning his delivery of the cocaine is completely incredible because the video tape showed that Portuondo-Gonzalez was outside doing yard work at the time, not in the kitchen as Rosalez claimed. However, even assuming that Rosalez did not accurately recall where the conversation occurred, this would not preclude the jury from finding that Jambu delivered the cocaine and made the statements attributed to him at some other location on his way into the residence. It was for the jury to determine the credibility of Rosalez's testimony and the weight to be given that testimony. Jambu's convictions

The defendant, as the proponent of the downward adjustment, bears the burden of proving a mitigating role in the offense by a preponderance of the evidence. *United States v. Owusu*, 199 F.3d 329, 337 (6th Cir. 2000). We review a district court's denial of a mitigating role adjustment to a defendant's offense level for clear error. *Id.*[6]

The record reveals that Salgado drove the vehicle containing seven kilograms of cocaine from Miami, Florida, to Louisville, Kentucky. The transportation of the cocaine from Florida was an act crucial to the success of the criminal scheme. Further, Salgado's role was not limited to simply transporting the cocaine. During the trip, Salgado communicated with Portuondo-Gonzalez via cell phone. He met with Portuondo-Gonzalez at a restaurant and exchanged the vehicle for Portuondo-Gonzalez's Toyota Camry, thereby facilitating Portuondo-Gonzalez's unloading of the cocaine, then drove the Camry to Portuondo-Gonzalez's residence. Salgado was at the Portuondo-Gonzalez residence when the sale of five kilograms of cocaine to the informant was supposed to occur.

In addition, Salgado was not held accountable for the full amount of cocaine involved in the conspiracy. Portuondo-Gonzalez told investigators that he had made four trips to Florida to obtain cocaine, including the 2,754.2 grams of cocaine sold to Heath on April 27, 1998. There was evidence that Salgado himself transported seven kilograms of cocaine to Louisville on May 1, 1998, but his relevant conduct was limited to the quantity of 5,011 grams of cocaine which was to be sold to Heath. It is this transaction which is relevant for purposes of applying the mitigating role adjustment. The

---

[6] In *Owusu*, this court proposed that the two-part standard of review used in the context of aggravating role adjustments, under which a district court's factual findings are reviewed for clear error while its legal conclusions are reviewed de novo, would be equally appropriate in the context of mitigating role adjustments. *See id.* at 337 n.2. Since the result we reach in the instant cases would be the same under either standard, we need not resolve this issue here.

For purposes of applying a minor role adjustment under § 3B1.2(b), "a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." *Roberts*, 223 F.3d at 379; U.S.S.G. § 3B1.2(b), comment. (n.3).

A defendant who plays a lesser role in a criminal scheme may nonetheless fail to qualify as a minor participant if his role was indispensable or critical to the success of the scheme, or if his importance in the overall scheme was such as to justify his sentence. *United States v. Latouf*, 132 F.3d 320, 332 (6th Cir. 1997)("A defendant whose participation is indispensable to the carrying out of the plan is not entitled to a role reduction."), *cert. denied*, 523 U.S. 1101 (1998); *United States v. Burroughs*, 5 F.3d 192, 194-95 (6th Cir. 1993)(reduction properly denied where defendant played key role).

In determining whether to award the defendant a reduction for a mitigating role in the offense, the district court must consider the portion of the relevant conduct of the conspiracy that was attributable to the defendant for purposes of determining his base offense level. *Roberts*, 223 F.3d at 380-81 (in sentencing drug conspiracy defendant, district court properly looked only to the relevant conduct attributed to defendant for purposes of determining his base offense level in determining whether to apply mitigating role adjustment). *See also United States v. Roper*, 135 F.3d 430, 434 (6th Cir.)("The salient issue is the role the defendant played in relation to the activity for which the court held him or her accountable."), *cert. denied*, 524 U.S. 920 (1998); *United States v. Welch*, 97 F.3d 142, 152 (6th Cir. 1996)(reduction inappropriate where full amount of drugs in conspiracy was not attributed to defendant); *United States v. Walton*, 908 F.2d 1289, 1303 (6th Cir.)(noting that while defendants were minor participants in relation to the scope of the conspiracy as a whole, they were not entitled to a role reduction since they were only held accountable for the quantities of cocaine they were actively involved in distributing), *cert. denied*, 498 U.S. 990 (1990).

for conspiracy and possession with the intent to distribute cocaine are supported by sufficient evidence.

### III.  *Admissibility of Statements Under Rule 801(d)(2)(E) of the Federal Rules of Evidence*

Salgado and Jambu both contend that the trial court erred in admitting into evidence the testimony of co-conspirator Daniel Rosalez concerning a conversation he overheard between indicted co-conspirator Portuondo-Gonzalez and Garcia, an unindicted co-conspirator. Rosalez testified that during the week prior to May 1, 1998, he overheard Portuondo-Gonzalez and Garcia discussing the fact that someone named "Wicho" was driving the silver Mustang containing the cocaine up from Florida. The trial court found that this evidence was admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence as the statements of co-conspirators in furtherance of the conspiracy.

Rule 801(d)(2)(E) provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." FED.R.EVID. 801(d)(2)(E). To admit statements under this rule, the government must establish that: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the statement was made in furtherance of the conspiracy. *United States v. Clark*, 18 F.3d 1337, 1341 (6th Cir.), *cert. denied*, 513 U.S. 852 (1994). The government must establish these facts by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). In determining whether a statement is admissible under Rule 801(d)(2)(E), the court may consider the contents of the statement itself in weighing the evidence. *Bourjaily*, 483 U.S. at 181; *Maliszewski*, 161 F.3d at 1008. These factual determinations are reviewed for clear error. *Clark*, 18 F.3d at 1341. The ultimate legal conclusion as to the admissibility of the statement is subject to *de novo* review. *United States v. Carter*, 14 F.3d 1150, 1155 (6th Cir.), *cert. denied*, 513 U.S. 853 (1994).

A statement is made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy. *Clark*, 18 F.3d at 1342; *Carter*, 14 F.3d at 1155. Mere "idle chatter" or conversations which further the speaker's own individual objectives rather than the objectives of the conspiracy are not made in furtherance of the conspiracy. *See Maliszewski*, 161 F.3d at 1009. However, "statements which identify the participants and their roles in the conspiracy are made 'in furtherance' of a conspiracy." *Clark*, 18 F.3d at 1342.

Statements which identify another co-conspirator as the source of drugs involved in the conspiracy are in furtherance of the conspiracy. *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992); *United States v. Rios*, 842 F.2d 868, 874 (6th Cir. 1988), *cert. denied*, 488 U.S. 1031 (1989). The "in furtherance" rule is also satisfied "when a co-conspirator is apprised of the progress of the conspiracy" and "when statements are 'made to keep a conspirator abreast of a co-conspirator's activities, or to induce continued participation in a conspiracy, or to allay [his] fears....'" *Rios*, 842 F.2d at 874 (quoting *United States v. Layton*, 720 F.2d 548, 557 (9th Cir. 1983), *cert. denied*, 465 U.S. 1069 (1984)).

There is sufficient evidence in the record to support the trial court's determination that a conspiracy existed and that Salgado, Jambu, Portuondo-Garcia, Rosalez and Garcia were members of the conspiracy. Further, the statements in question involved more than mere "idle chatter." The conversation concerning "Wicho" driving the cocaine-loaded Mustang from Florida was designed to inform co-conspirators that a substitute driver for Garcia, who usually drove the car up from Florida, had been found, and that a new supply of cocaine to satisfy Heath's request for an additional quantity would in fact be delivered. This conversation apprising a conspirator of the progress of the conspiracy and of a co-conspirator's activities was properly found to be "in furtherance" of the conspiracy. *See Rios*, 842 F.2d at 874.

building's parking lot. Just as the lock on a car door is designed to protect any property left in the car and to ensure privacy inside the vehicle, an apartment door lock functions to protect and keep private the contents of the apartment. The information gained by the officers in inserting a key into an apartment door is the same as that gained by inserting a key into a car door, namely, that the key works the lock. The fact that a person may have a greater expectation of privacy in the inside of his residence than in the interior of a vehicle, which is more visible to the public by reason of its design, does not warrant applying a different standard to an apartment door lock which was just as accessible to the public in this case as an automobile lock.[5]

The trial court properly denied Jambu's motion to exclude the evidence of the key fitting the lock to his apartment.

## VII.  *Salgado Sentencing Issues*

### A.  *Denial of Mitigating Role Reduction*

Salgado contends that he should have received an offense level reduction for mitigating role pursuant to U.S.S.G. § 3B1.2(a) as a minimal participant. The government opposed such a reduction. In rejecting Salgado's claim that he was entitled to a mitigating role adjustment, the trial court found that "the role here of Mr. Salgado in moving this quantity of cocaine up here from Florida for distribution up here is hardly minor in that...it does not make him less culpable than most other participants." The court stated, "I don't think that Mr. Salgado could by any stretch be even referred to as a minor participant, much less a minimal

---

[5] Jambu also argues that *Allinder v. State of Ohio*, 808 F.2d 1180 (6th Cir. 1987), which declined to extend the "open fields" doctrine to the search of containers or buildings found in the field, should be applied by analogy to this case. However, *Allinder* is inapposite, because in this case there was no search of the contents of the apartment and, under *DeBardeleben*, the mere insertion of the key was not a search.

Salgado and Jambu also argue that the admission of this testimony was error because Portuondo-Gonzalez, one of the participants in the conversation, had pleaded guilty and could have been called by the government to testify. However, Rule 801(d)(2)(E) contains no requirement that the conspirator declarant be unavailable before evidence of the conspirator's statements is admissible. Likewise, the Confrontation Clause does not require a showing of unavailability of the declarant as a condition to the admission of the out-of-court statements of the nontestifying conspirator when those statements otherwise satisfy Rule 801(d)(2)(E). *United States v. Inadi*, 475 U.S. 387, 399-400 (1986).

Salgado also argues that Rosalez's testimony concerning the alleged conversation between Jambu and Portuondo-Gonzales when Jambu delivered the cocaine should not have been admitted because it lacked sufficient guarantees of reliability. Salgado contends that, while Rosalez described this conversation as occurring in the kitchen, the surveillance video tape showed that when Jambu arrived, Portuondo-Gonzalez was outside doing yard work. However, even if Rosalez was mistaken or lying as to where the conversation between Jambu and Portuondo-Gonzalez occurred, the jury could have found that the conversation occurred at some other location and that Jambu delivered the cocaine.

Salgado further notes that a juror who recognized Rosalez was excused when he indicated that, based on prior contacts with Rosalez, he would have difficulty believing him.[1] The fact that the excused juror had reasons of his own unrelated to the circumstances of the case or his observations of the witness at trial to suspect the testimony of Rosalez does not mean that the twelve jurors who actually decided the case could not believe Rosalez's testimony.

---

[1] These contacts consisted of the juror, a firefighter, responding to minor fires at Rosalez's store on five occasions. The juror had formed the opinion that Rosalez was not compliant with fire regulations.

We have held that some independent, corroborating evidence beyond the co-conspirator's statements themselves showing the defendant's knowledge of and participation in the conspiracy is required before a co-conspirator's statement will be admissible. *Clark*, 18 F.3d at 1341-42. However, evidence corroborating Salgado's and Jambu's membership in the conspiracy was produced in this case, and the trial court properly found that the prerequisites for admission of the statements under Rule 801(d)(2)(E) had been satisfied.

Where it has been established by a preponderance of the evidence that a conspiracy existed, that the defendant was a member of the conspiracy, and that the statement was made in furtherance of the conspiracy, "the Confrontation clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." *Bourjaily*, 483 US. at 183-84. Once the statements were admitted, it was for the jury to determine what weight or credibility to assign the statements and the testimony of Rosalez. The trial court did not err in admitting evidence of the conversation between Portuondo-Gonzalez and Garcia as the statements of co-conspirators.

*IV.  Admissibility of Computer Records*

Jambu raises as error the admission of certain telephone toll records of South Central Bell for telephone numbers subscribed to by Jambu and Portuondo-Gonzalez as business records under Rule 803(6) of the Federal Rules of Evidence. In reviewing a trial court's evidentiary determinations, this court reviews *de novo* the court's conclusions of law and reviews for clear error the court's factual determinations that underpin its legal conclusions. *United States v. Reed*, 167 F.3d 984, 987 (6th Cir.), *cert. denied*, 120 S.Ct. 229 (1999).

A business record must satisfy four requirements in order to be admissible under Rule 803(6):

(1) it must have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular

not need probable cause to inspect it, and the search was not unreasonable under the Fourth Amendment. *Id.* at 1172-73.[3]

Under *DeBardeleben*, the mere insertion of a key into a lock, by an officer who lawfully possesses the key and is in a location where he has a right to be, to determine whether the key operates the lock, is not a search. That is what happened in the case before us.[4]

Jambu argues that one has a greater privacy interest in one's apartment than one does in a vehicle, and that therefore *DeBardeleben*, which involved an automobile lock, should not control. However, the lock to Jambu's apartment was accessible by means of an unlocked, common hallway which was open to the public. Jambu had no reasonable expectation of privacy in this hallway. The lock to his apartment door was just as accessible to anyone passing through that hallway as the lock on his car door was to anyone passing through the

---

[3]In *Concepcion*, the court also addressed the question of whether the use of those seized keys to enter the locked common area of the apartment building where the apartment door was located, was an unreasonable search; the court concluded that the defendant had no expectation of privacy in the common area of the building. While we note that the law in the Seventh Circuit differs from the law in this circuit, *see United States v. Carriger*, 541 F.2d 545 (6th Cir. 1976)(recognizing that tenant has reasonable expectation of privacy in locked common areas of an apartment complex), that issue does not concern us here, where it is undisputed that the common area onto which the door of Jambu's apartment opened was unlocked.

[4]This case is distinguishable from *United States v. Portillo-Reyes*, 529 F.2d 844 (9th Cir. 1975), where the officer conducted a search of the passenger compartment of the vehicle after opening the door with a key. There, the Ninth Circuit held that the insertion of the key was the "beginning of the search." *Id.* at 848. We note that in *United States v. $109,179 in United States Currency*, 228 F.3d 1080 (9th Cir. 2000), the Ninth Circuit recently rejected the argument that *Portillo-Reyes* stands for the proposition that the mere insertion of a key into a lock constitutes a "search" and held that the use of a key in that case solely to determine which vehicle in a hotel parking lot belonged to the defendant was not an unreasonable search proscribed by the Fourth Amendment.

the lock to his apartment door, and that trying the key in the lock constituted an illegal search.

In *DeBardeleben*, we held that the insertion of keys into the lock of an automobile was "a minimal intrusion, justified by a 'founded suspicion' and by the legitimate crime investigation" which did not constitute a search within the meaning of the Fourth Amendment. *DeBardeleben*, 740 F.2d at 444-45 (quoting *United States v. Portillo-Reyes*, 529 F.2d 844, 852 (9th Cir. 1975)(Wright, J., dissenting), *cert. denied*, 429 U.S. 899 (1976). We noted that the agent in that case, "acting on a reasonable belief that the car belonged to defendant, did not *search* the Chrysler but merely *identified* it as belonging to defendant." *DeBardeleben*, 740 F.2d at 445 (emphasis in original).

In *United States v. Lyons*, 898 F.2d 210 (1st Cir.), *cert. denied*, 498 U.S. 920 (1990), the First Circuit relied on *DeBardeleben* in holding that the insertion of a key into the padlock of a storage unit was not a search, or, in the alternative, was not an unreasonable search prohibited by the Fourth Amendment. The court noted that the insertion of the key into the lock of the storage unit was merely a means of identifying a storage unit to which the defendant had access. *Lyons*, 898 F.2d at 213. The court further stated that the lock was placed on the door to protect the contents of the storage unit, and that "it is those contents that are the object of the lessee's privacy expectations, not the padlock. By placing personal effects inside the storage unit, Lyons manifested an expectation that the *contents* would be free from public view." *Id.* (emphasis in original).

In *United States v. Concepcion*, 942 F.2d 1170 (7th Cir. 1991), the court addressed, among other issues, the question of whether law enforcement officers' use of keys seized from the defendant to try the lock to the door of an apartment without entering the apartment constituted an unreasonable search. The court found that the insertion and turning of the key in the lock constituted a "search," but that the lessee's privacy interest in the lock was so small that the officers did

practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

*United States v. Weinstock*, 153 F.3d 272, 276 (6th Cir. 1998)(quoting *Redken Laboratories, Inc. v. Levin*, 843 F.2d 226, 229 (6th Cir.), *cert. denied*, 488 U.S. 852 (1988)). This information must be presented through "the testimony of the custodian or other qualified witness[.]" FED.R.EVID. 803(6). Business records meeting these criteria are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id.*

"Rule 803(6) does not require that the custodian personally gather, input, and compile the information memorialized in a business record." *Weinstock*, 153 F.3d at 276. The custodian of the records need not be in control of or have individual knowledge of the particular corporate records, but need only be familiar with the company's recordkeeping practices. *Id.* (citing *In re Custodian of Records of Variety Distrib., Inc.*, 927 F.2d 244, 248 (6th Cir. 1991)). Likewise, "[t]o be an 'other qualified witness,' it is not necessary that the person laying the foundation for the introduction of the business record have personal knowledge of their preparation." *Dyno Construction Co. v. McWane, Inc.*, 198 F.3d 567, 575-76 (6th Cir. 1999).

A computer printout is admissible under Rule 803(6) as a business record if the offer or establishes a sufficient foundation in the record for its introduction. *United States v. Cestnik*, 36 F.3d 904 (10th Cir. 1994), *cert. denied*, 513 U.S. 1175 (1995)(holding computer-generated money transfer orders admissible). *See also Dyno Construction*, 198 F.3d at 576 (computer printout of business records held admissible); *United States v. Briscoe*, 896 F.2d 1476, 1494 (7th Cir. 1990)("It is well established that computer data compilations are admissible as business records under FED.R.EVID. 803(6)

if a proper foundation as to the reliability of the records is established.")

In this case, William Deering, Manager of Security for Bell South, was called by the government to testify concerning South Central Bell telephone records. He indicated that he was the authorized representative to bring records to court. The records in question contained subscriber line information, including the subscriber's name, the location where the telephone was installed, the date and duration of local and long distance telephone calls, the numbers from which calls were placed and at which they were received, and billing amounts. *Id*. pp. 374-376. The telephone numbers involved in the calls were recorded by computer contemporaneous to the phone call being made and received, and the information was then stored in the computer to be downloaded as needed. *Id*. pp. 378-79, 383. Mr. Deering stated that it was a regular practice of Bell South to make these reports and keep these types of records, and that the records are relied on by Bell South to ensure accuracy of billing. *Id*. pp. 379, 383. The above information satisfies the first three criteria for admissibility under Rule 803(6).

Jambu argues that the fourth requirement, that the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge, was not satisfied because the actual record was memorialized and entered into the computer's memory by the computer itself rather than being entered by a person. Similar records have been held sufficiently reliable in other cases.

In *United States v. Linn*, 880 F.2d 209, 216 (9th Cir. 1989), the court held that a computer printout showing a call placed from a hotel room was admissible as a business record where the record was generated automatically and was retained in the ordinary course of business. In *Briscoe*, 896 F.2d at 1494-95, telephone subscriber data entered into the computer contemporaneous with the placing of each telephone call and maintained in the regular course of business for billing

The record reveals that Officer Rodney Seelye of the Louisville Division of Police found a key in a silver Mustang which the police had reason to believe was used to transport cocaine from Florida. The Mustang was found in the parking lot of Jambu's apartment complex, the Tanglewood Apartments on Bermuda Lane. Officer Seelye decided to investigate whether the key was to Jambu's apartment, as this would be evidence of Jambu's connection to the conspiracy. He proceeded to the building where Jambu's apartment was located and entered through an unlocked door into a common corridor open to the public. Officer Seelye knew the location of Jambu's apartment. He inserted the key into the front door of Jambu's apartment to determine whether the key worked the lock mechanism. He learned that the key did operate the lock, but he did not open the door or enter the apartment. This occurred after an earlier search of Jambu's apartment, the results of which were suppressed by the trial court.

The trial court found that this case involved "an insertion of the key for the discrete and only purpose of seeing whether it would turn the tumbler" and that it "was not the beginning of the search." The court found that the door was located on a hallway which was "a common area" and "public", and that the keyhole "is open, obvious, facing out into the public area," "not concealed," with unrestricted access. Relying on *United States v. DeBardeleben*, 740 F.2d 440 (6th Cir.), *cert. denied*, 469 U.S. 1028 (1984), the trial court concluded that the insertion of the key was not a search, that the defendant had no reasonable expectation of privacy in a keyhole that was open to the public side of the door, and that, even assuming that a search had occurred, the intrusion was minimal and justified by the circumstances. The trial court also found that the officer had lawful possession of the key, and that the legitimate interests of proper crime investigation permitted testing the key in the lock.

Jambu does not appear to contest the officer's version of what transpired, and the trial court's findings of fact are supported by the evidence and are not clearly erroneous. Rather, Jambu argues that he had an expectation of privacy in

courts. Thus, Rule 45(a) is properly applied to extend the time period in § 3161(b) where the last day would otherwise fall on a day when the courthouse is not open for business and the government has no access to the grand jury or the clerk of court.

The trial court properly denied Jambu's motion to dismiss the indictment under § 3162(a)(1).[2]

## VI. Admissibility of Evidence of Key Fitting Lock of Apartment Door

Jambu argues that the trial court should have suppressed testimony concerning the fact that a key found in the Mustang fit the lock of his apartment door. In reviewing a decision on a suppression issue, we review the lower court's findings of fact for clear error and its conclusions of law *de novo*. *United States v. Jenkins*, 124 F.3d 768, 771-72 (6th Cir. 1997). We must review the evidence in the light most likely to support the district court's decision. *United States v. Williams*, 962 F.2d 1218, 1221 (6th Cir.), *cert. denied*, 506 U.S. 892 (1992).

---

[2]The government also argues on appeal that certain periods of delay specified in 18 U.S.C. § 3161(h) are "excluded in computing the time within which an information or an indictment must be filed[.]" 18 U.S.C. § 3161(h). The government correctly notes that Jambu's May 14, 1998, motion for revocation of the detention order which was decided on July 2, 1998, resulted in a period of excludable time under 18 U.S.C. § 3161(h)(1)(F)(excludable time includes periods of "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion"). The record also indicates that May 4, 1998, the date of Jambu's initial appearance, and May 6, 1998, the date of his detention hearing, would also be excludable as a "period of delay resulting from other proceedings concerning the defendant[.]" 18 U.S.C. § 3161(h)(1); *Wright*, 990 F.2d at 149 (day of detention hearing excluded); *United States v. Crawford*, 982 F.2d 199, 203 (6th Cir. 1993)(date of first appearance excluded). Although these arguments were not presented to the trial court, they provide additional justification for the denial of Jambu's motion to dismiss.

---

purposes was held to be admissible. In *United States v. Miller*, 771 F.2d 1219, 1237 (9th Cir. 1985), the admission of computer-generated toll and billing records made contemporaneously by the computer itself was upheld.

Mr. Deering testified that he did not know the error rate in South Central Bell's billing system, and that he was unfamiliar with what programming was employed to ensure accuracy, although he did know that there were parameters for measurements of accuracy rates. Jambu argues that the instant case is thus distinguishable from *Briscoe*, where the evidence revealed that the computer scanned itself for error every fifteen seconds. *See Briscoe*, 896 F.2d at 1494.

The government is not required to present expert testimony as to the mechanical accuracy of the computer where it presented evidence that the computer was sufficiently accurate that the company relied upon it in conducting its business. *United States v. De Georgia*, 420 F.2d 889, 893 n.11 (9th Cir. 1969)(*cited in Miller*, 771 F.2d at 1237). *See also Weinstock*, 153 F.3d at 276 (witness not required to know personally how company performed safety checks); *Moore*, 923 F.2d 910, 915 (1st Cir. 1991)(not required that computers be tested for programming errors before computer records can be admitted under Rule 803(6)); *Briscoe*, 896 F.2d at 1494-95 (showing that computer was regularly tested for internal programming errors not a prerequisite to the admission of computer records). The record indicates that Mr. Deering testified that South Central Bell relied on these computer-generated records to ensure the accuracy of its billing. He was not required to testify concerning any programming features which were in place to guarantee accuracy.

Jambu also argues that Mr. Deering was not qualified to testify concerning these records because he was not sufficiently familiar with the computer system. Mr. Deering testified that he was not the individual who programmed the computer. However, it is not necessary that the computer programmer testify in order to authenticate computer-

generated records. *Linn*, 880 F.2d at 216; *Miller*, 771 F.2d at 1237; *United States v. Young Bros., Inc.*, 728 F.2d 682, 694 (5th Cir.), *cert. denied*, 469 U.S. 881 (1984). Likewise, the fact that Deering did not obtain the computer-generated records himself but rather asked someone else to provide him with the records called for in the subpoena did not mandate the exclusion of the records. *See Dyno Construction*, 198 F.3d at 576 (fact that witness not involved in the preparation of the printed computer records and did not know who prepared them were not matters that precluded admission of documents as business records). Mr. Deering sufficiently demonstrated that he was familiar with the recordkeeping system employed by Bell South.

The district court properly concluded that the telephone records in question were trustworthy and that the government had established an adequate foundation for the admission of those records as business records under Rule 803(6).

*V.  Compliance with Speedy Trial Act*

Jambu alleges that the government failed to indict him within thirty days of his arrest on May 1, 1998, as required under the Speedy Trial Act, 18 U.S.C. § 3161(b), and that the indictment returned against him on June 1, 1998, should have been dismissed under 18 U.S.C. § 3162(a)(1). The district court's application of the Speedy Trial Act is reviewed *de novo*. *United States v. Graef*, 31 F.3d 362, 363 (6th Cir. 1994).

Section 3161(b) provides:

> Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.

18 U.S.C. § 3161(b). If the time limit of that section is exceeded, "such charge against that individual contained in

such complaint shall be dismissed or otherwise dropped." 18 U.S.C. § 3162(a)(1).

A defendant is not "arrested" for purposes of the Speedy Trial Act until formal federal charges are pending, that is, when a formal complaint or charge is issued. *Graef*, 31 F.3d at 363-64; *United States v. Blackmon*, 874 F.2d 378, 381 (6th Cir.), *cert. denied*, 493 U.S. 859 (1989). Although Jambu was arrested on May 1, 1998, the formal complaint and federal arrest warrant were not filed or issued until May 3, 1998. Since no formal federal charges were pending until May 3, 1998, the indictment returned on June 1, 1998, was filed within the thirty-day limit.

The trial court also found that the indictment was timely because the thirtieth day following May 1, 1998, fell on Sunday, May 31, 1998, and therefore the deadline for indictment was extended to Monday, June 1, 1998. The trial court relied on Rule 45(a) of the Federal Rules of Criminal Procedure, which provides that where the last day of a period falls on a Saturday, Sunday, or legal holiday, the period runs until the end of the next day which is not one of these days. Rule 45(a) has been applied to extend the statutory time period for returning an indictment. *See United States v. Wright*, 990 F.2d 147, 149 (4th Cir.), *cert. denied*, 510 U.S. 870 (1993); *Blackmon*, 874 F.2d at 382.

Jambu argues that Rule 45(a) should not be applied to extend the time limit in § 3161(b) because it is the United States attorney who determines when criminal prosecutions will be initiated. He contends that the procedural rules of the court should not apply to such actions beyond the court's control. However, it is the district court which has the authority under Rule 6(a) of the Federal Rules of Criminal Procedure to summon the grand jury to which the government's evidence must be presented in order to secure an indictment. *See* FED.R.CRIM.P. 6(a)("The court shall order one or more grand juries to be summoned at such time as the public interest requires."). Further, § 3161(b) requires that the indictment be "filed" within thirty days with the clerk of