**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0945n.06

**No. 10-5891**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Aug 27, 2012**

LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff - Appellee, | ) |
| | ) ON APPEAL FROM THE UNITED |
| v. | ) STATES DISTRICT COURT FOR THE |
| | ) WESTERN DISTRICT OF KENTUCKY |
| MYRON YOUNG, | ) |
| | ) OPINION |
| Defendant - Appellant. | ) |

Before: SUHRHEINRICH, STRANCH, and DONALD, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge. Myron Young appeals his jury conviction for conspiracy to distribute more than fifty grams of crack cocaine, as well as the enhanced statutory mandatory minimum sentence of life imprisonment the district court imposed. Because the issues raised on appeal are without merit, we **AFFIRM**.

**I. FACTS AND PROCEDURAL HISTORY**

A federal grand jury indicted Young, his son, Zachary Young, Donnie Williams, and Britney Williams on one count of drug conspiracy under 21 U.S.C. §§ 841(a)(1) and 846. The government later dismissed the charge against Britney Williams, and Donnie Williams entered a guilty plea. Both of them testified against Young and his son at a jury trial, as did Laura Callison Edwards Watson, a confidential informant for Kentucky State Police Detective Tim Simpson.

1

Watson first met Myron Young more than twenty years ago. She had purchased powder cocaine from him for years. In January 2008, Watson purchased crack cocaine from Young and became severely addicted. Between January and April 2008, she spent thousands of dollars, including her own funds and "buy" money provided to her by Detective Simpson, to purchase crack cocaine from Young and his son. Watson described the relationship between the Youngs as "pretty much a partnership." She bought crack cocaine from both of them, and if one did not have any crack to sell, he directed Watson to contact the other to make a purchase.

In March and April 2008, Watson made numerous controlled purchases of crack cocaine from the Youngs in her role as a confidential informant. The police recorded her telephone calls with the two men; searched her body and her car before and after the drug buys; documented the state's "buy" money by recording the serial numbers of the bills in advance of the drug deals; fitted Watson with a wire for audio recordings; documented some of the drug deals on video and in photographs; and conducted surveillance during the drug deals.

On March 18, Watson paid Myron Young $100 for 605 milligrams of crack cocaine. On March 20 and 21, Watson asked Myron Young to sell her one-quarter ounce to one-half ounce of crack. Young asked Watson if she was working with the police, but Watson assured him that she was not. Young sold Watson 5.40 grams of crack cocaine.

On March 24, Watson went to Zachary Young's apartment, where she paid Zachary's girlfriend, Britney Williams, $100 while Zachary retrieved the drug from another room. When Watson handed her purchase to Detective Simpson, he realized that Zachary had sold Watson one gram of powder cocaine. At Detective Simpson's direction, Watson called Zachary and told him that she would keep the powder and cook it into crack, but the next time she wanted crack.

2

On March 25, Watson called Myron Young to buy crack cocaine. Young met Watson in his garage, where he sold her 1.38 grams of crack for $220. Later the same day, Watson called Myron Young asking for more crack cocaine, but he told her he was in Tennessee. Young asked Watson to wait for his return, but when she "showed impatience," he told her to contact Zachary. Soon after this conversation, Zachary called Watson, but the police directed her not to answer the call. Myron Young then called Watson asking why she did not take Zachary's call. At that point, Watson called Zachary to arrange for the purchase of one-eighth ounce of crack. Zachary asked Watson when she planned to pay the $120 she owed him and she promised to bring the money. Watson then went to Zachary's residence where she bought 1.613 grams of crack cocaine.

On March 27, Watson called Myron Young to buy one-quarter ounce of crack. Young delivered 4.28 grams of crack to Watson's apartment in exchange for $400. A black male rode in the vehicle with Myron Young. On March 29, Watson again called Myron Young asking to buy one-half ounce of crack for $800. Young instructed Watson to come to his house for the deal. Young directed Watson to lift her shirt so he could see if she was wearing a wire. Not finding the wire, he sold Watson 9.28 grams of crack cocaine.

On April 8, Watson called Myron Young and asked to buy one-eighth ounce of crack cocaine. Young raised the price from $220 to $230. Watson went to Young's house as directed, but Young was digging a ditch. Donnie Williams dropped 2.35 grams of crack into Watson's car and told her to put her money in the glove on the picnic table. On April 9, Watson called Zachary Young to buy crack. Zachary, Britney Williams, and an unidentified black male delivered 1.51 grams of crack cocaine to Watson.

3

On April 11, Watson called Myron Young asking to buy one-quarter ounce of crack. Young told Watson to go to his house where "Squirrel" (Donnie Williams) would get the crack for her. When Watson arrived at Young's house, Williams told her to get the crack out of a cup in the office and to put her $420 into the cup. On April 14, Watson again called Myron Young to buy crack. He told her to go to his house and "see Marco." Watson met Marco Mitchell in the garage where he gave her 3.98 grams of crack in exchange for $420.

On April 16, Watson asked Myron Young to sell her one-quarter ounce of crack cocaine for $420. Young first told Watson that the cocaine was still in powder form and the crack was not ready. Later, after Young finished cooking the cocaine powder into crack, he delivered 3.90 grams of crack to Watson at her apartment.

On April 18, Watson asked Myron Young to sell her one ounce of crack for $800, but Young did not think he had an ounce to sell. Later that day, Young offered to sell Watson one-half ounce of powder cocaine, but Watson declined because of the price. Young explained to Watson that Donnie Williams had been his crack cocaine cook, but that Williams could not work for him anymore because Williams tested positive for drugs while on probation. When Watson stated that she did not want to buy powder cocaine, Young agreed to cook the cocaine into crack himself and he delivered 8.28 grams of crack to Watson at a bowling alley parking lot.

Watson went to Myron Young's house on April 23 where she purchased 1.34 grams of crack for $230. On April 25, Watson met Myron Young in an Auto Zone parking lot where she purchased one-eighth ounce of crack for $230.

Watson talked to Myron Young on April 26 about buying one-eighth ounce of crack, but Young said he did not have any and to call Zachary Young. When Watson could not reach Zachary

4

by phone, she called Myron again. He told her he had only powder cocaine. A short time later, Watson made a deal to buy $225 of crack from Zachary. Watson did not have enough money, so she met Zachary later in the day to pay him the rest of what she owed. The last controlled drug buy occurred on April 28. Watson bought one-quarter ounce of crack from Myron Young at his house for $420.

The next day, the police executed search warrants at the residences of Myron Young and Zachary Young. Myron Young was present and cooperative during the search of his home and garage. He showed the police where to find illegal drugs and cash proceeds. Police seized 60.189 grams of powder cocaine, 7.731 grams of crack cocaine, eighty-eight hydrocodone pills, digital scales, over $3,340 in cash, and blue paper towels like the ones Young had used to wrap crack cocaine that he delivered to Watson.

Zachary Young and Britney Williams were present during the search of their home. Officers found 93.13 grams of powder cocaine, 918 milligrams of crack cocaine, digital scales, one hydrocodone pill, 0.7 grams of marijuana, a partially smoked marijuana cigarette, and three $20 bills with serial numbers that matched buy money Watson had used to purchase drugs.

At trial Donnie Williams testified that he conspired with Myron Young and others to knowingly and intentionally distribute cocaine base. Athough Williams minimized his participation in the conspiracy, he admitted that Myron Young contacted him on April 8 and 11, 2008, and asked him to make drug deliveries to Watson.

Britney Williams testified that she accompanied Zachary Young when he went to his father's house "with money and left with cocaine." Zachary gave about half the money he earned selling drugs to his father to purchase more cocaine. She estimated that Zachary sold fifteen baggies of

5

cocaine a day based on the number of telephone calls he received. She identified photographs kept at their residence that showed Zachary holding cocaine and a brown paper bag full of money that he made by selling cocaine. Britney testified that she participated in Zachary's drug sales because he was physically abusive to her and forced her to assist him. She also knew that Zachary cooked cocaine into crack, but she never watched him do it.

Zachary Young testified in his own defense that he was addicted to drugs and that he used approximately one gram of cocaine each day. He claimed that Britney was also addicted and that they used drugs together. By the time the search warrant was executed, they were using two to three grams of cocaine per day. He denied abusing Britney, and he denied any involvement in the drug deals except for "dealing with [Watson] directly." He claimed that he used drugs with Watson and loaned her money.

Myron Young did not testify. The district court denied Young's motions for judgment of acquittal. While the jury was deliberating, Zachary Young entered a guilty plea. The jury convicted Young of engaging in a conspiracy to distribute at least fifty grams of crack cocaine. The district court imposed the statutory mandatory minimum sentence of life imprisonment based on Young's prior felony drug convictions, and this appeal followed.

## II. ANALYSIS

Young raises four issues on appeal. We examine each issue in turn.

### A. Sufficiency of the evidence

#### 1. Standard of review

We review *de novo* the district court's denial of a motion for judgment of acquittal. *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001). To evaluate whether the trial evidence was

sufficient to convict, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Although more than a scintilla of evidence is necessary, a sufficient verdict may be based on entirely circumstantial evidence and the jury need not rule out completely other possibilities besides guilt. *United States v. Sherlin*, 67 F.3d 1208, 1214 (6th Cir. 1995); *Salgado*, 250 F.3d at 446. In evaluating the sufficiency of the evidence, we do not weigh the evidence, assess the credibility of the witnesses, or substitute our own judgment for that of the jury. *Salgado*, 250 F.3d at 446. We draw all available inferences and resolve all credibility issues in favor of the jury verdict. *Id.*

*2. The evidence was sufficient to convict Young of drug conspiracy*

To establish the existence of a conspiracy under 21 U.S.C. § 846, the government is required to prove beyond a reasonable doubt: "(1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *Id*. An agreement to violate the drug laws does not have to be express or formal; it is enough for the government to show a tacit or mutual understanding among the parties. *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006). Yet the evidence must demonstrate that the defendant had knowledge of the object of the conspiracy and consciously committed himself in furtherance of that object. *Id.* Conspiracy can be inferred through circumstantial evidence, including evidence of repeated purchases, or evidence of a large quantity of drugs. *Id.* A defendant's mere presence at a crime scene is not enough to draw a link, but a defendant's participation in a conspiracy may be inferred from his actions and reactions to the circumstances. *Salgado*, 250 F.3d at 447. While the government must prove the existence

7

of the conspiracy beyond a reasonable doubt, the defendant's connection to the conspiracy need only be slight. *United States v. Gibbs*, 182 F.3d 408, 422 (6th Cir. 1999).

Young contends that the government did not prove that he entered into an agreement with another person to distribute crack cocaine. He argues, correctly, that his participation in a drug conspiracy could not be proved by his distribution of drugs to the confidential informant, *see United States v. Rogers*, 118 F.3d 466, 477 (6th Cir. 1997), and he alleges that he merely supplied drugs to Zachary in a buyer-seller relationship for eventual distribution to customers, *see United States v. Anderson*, 89 F.3d 1306, 1310 (6th Cir. 1996) (noting settled principle that mere sales do not prove the existence of a conspiracy).

Reviewing the evidence in a light favorable to the verdict, we cannot agree with Young's characterization of the evidence. Young's business relationship with his son, Zachary, was more than a simple buyer-seller relationship. The jury heard evidence that Young and his son coordinated drug deals with Watson, and if they did so with her, the jury could reasonably infer that they coordinated drug deals with other customers as well. If one did not have any drugs to sell, he referred the business to the other. When Young was out-of-state and Watson was impatient to obtain crack cocaine, Young referred her to Zachary, but Watson did not call Zachary to arrange for a drug purchase; Zachary called her. The jury could rationally infer from this sequence of events that Young called his son and directed him to sell crack cocaine to Watson. When Zachary called Watson, the police instructed Watson not to answer the call. Young then contacted Watson and wanted to know why she ignored Zachary. The jury could logically infer that Zachary told his father he could not reach Watson, which prompted Young to call Watson himself. This exchange of telephone calls indicates that Young and his son entered into an agreement to sell crack cocaine to

8

Watson, and Young was not simply supplying his son with illegal drugs to sell to his own customers. The district court instructed the jury on the law applicable to conspiracy, as well as buyer-seller relationships, and the court explained to the jury that a mere buyer-seller relationship was not enough to return a guilty verdict. By convicting Young, the jury obviously rejected his theory that he was only a supplier, and not a co-conspirator in a chain conspiracy. *See Caver*, 470 F.3d at 233–34.

In addition, there were other co-conspirators who assisted Young in distributing crack cocaine to Watson. Donnie Williams was a crack cocaine "cook" for Young. Williams admitted that he entered into a drug conspiracy with Young to sell crack cocaine. He described how Young contacted him for assistance to provide crack to Watson and collect her payments on two occasions when Young was not available to conduct the sales himself. The jury judged the credibility of Donnie Williams and may well have determined that he was another co-conspirator to Young.

Additional co-conspirators were Britney Williams and Marco Mitchell. Williams admitted that she assisted Zachary Young in distributing cocaine to Watson and in collecting Watson's payment. She also admitted that she was initially charged as a co-conspirator, but that the government dismissed the charge against her. Mitchell sold Watson crack cocaine at the direction of Myron Young. Thus, there were at least two, and perhaps three or more, other members of the drug conspiracy involved in sales to Watson.

The jury was also entitled to take into account as evidence of conspiracy the repeated drug purchases Watson made when she was not acting in the role of a confidential informant for the police. Watson explained that her addiction was so severe that she made additional crack cocaine purchases from Myron Young during the same time period she was making undercover buys for the police, even though the officers directed her not to make purchases for her personal use. Watson

9

also testified that she used the money the police paid her for acting as a confidential informant to buy more crack cocaine from Myron Young for her own personal use.

In addition, the conspiracy involved a large quantity of powder and crack cocaine, even excluding the amounts Watson purchased as a confidential informant. Watson testified that she obtained powder cocaine from Young "for years," and Britney Williams estimated that Zachary Williams sold fifteen baggies of cocaine each day. Zachary obtained the cocaine he sold from Myron Young. Thus, the jury could properly infer that some unnamed co-conspirator supplied Myron Young and the conspiracy with a large quantity of cocaine for distribution.

Young contends that his case is like *United States v. Logan*, 372 F. App'x 601 (6th Cir. 2010), where this court reversed a drug conspiracy conviction for insufficient evidence. The facts of *Logan* are distinguishable from the facts here. *Logan* involved only two undercover drug purchases, and this court held that the government did not produce sufficient evidence to show an agreement among the alleged co-conspirators. *Id.* at 605–06. The court found the government's evidence in *Logan* to be "considerably less" than the court found to be sufficient in other cases, such as *United States v. Robinson*, 547 F.3d 632, 640–41 (6th Cir. 2008), *Caver*, 470 F.3d at 233–34, and *United States v. Henley*, 360 F.3d 509, 513–14 (6th Cir. 2004). *Id.* at 606. We conclude that the present case is more like *Robinson*, *Caver,* and *Henley* than *Logan.* The government proved that multiple drug transactions took place and that Myron Young had other co-conspirators, including at a minimum: his supplier; his son, Zachary Young; Donnie Williams; Marco Mitchell; and Britney Williams.

Young has not carried his heavy burden to demonstrate that the evidence was insufficient to prove conspiracy. *See Salgado*, 250 F.3d at 446. A rational trier of fact could have found the

10

essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. Accordingly, we affirm on this issue.

## B. **Mistrial** *sua sponte*

### 1. *Standard of review*

We ordinarily review a district court's denial of a motion for a mistrial under an abuse of discretion standard. *United States v. Howard*, 621 F.3d 433, 458 (6th Cir. 2010). Young's counsel did not move for a mistrial. Thus, the parties agree that the applicable standard of review is plain error. *See Caver*, 470 F.3d at 245. Young must show an error, that was plain, and that affected his substantial rights. If he satisfies those three factors, he must also show that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Thomas*, 11 F.3d 620, 630 (6th Cir. 1993). "Plain error is defined as an egregious error, one that directly leads to a miscarriage of justice." *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir. 1988).

### 2. *Young did not satisfy the plain error standard*

Young contends that the district court should have granted a mistrial *sua sponte* after the prosecutor elicited certain testimony from Detective Simpson, who appeared as the government's first witness. During Detective Simpson's direct examination, the government introduced numerous audio recordings of Watson's controlled drug purchases from Myron Young. On cross-examination, defense counsel questioned how Detective Simpson recognized Young's voice on the audiotapes. On redirect examination, Detective Simpson testified that he had known Young since the mid-1990's in a "professional" and "law enforcement context," and that he had heard Young's voice "several times" over that ten-year period during drug investigations. When the prosecutor asked if Young was an informant or a suspect in those investigations, Detective Simpson answered, "He would have

11

been a suspect." When the prosecutor asked Detective Simpson to give the number of such prior investigations, defense counsel objected, prompting the court to call a bench conference.

At the sidebar, the prosecutor explained that his line of questioning was intended to respond to the cross-examination, but the district court advised him to "leave it alone." Defense counsel did not move to strike any part of Detective Simpson's prior testimony, nor did he request a mistrial or a curative instruction. When the trial resumed, the district court did not state on the record that the defense objection had been sustained, but the prosecutor moved on to a different topic.

In evaluating the claim raised for the first time on appeal that the district court should have granted a mistrial *sua sponte*, we ask whether the challenged testimony was improper, and if so, whether it "'was so clearly improper and prejudicial to the defendant[] that the harm could not be erased by any instruction which the court might give.'" *Howard*, 621 F.3d at 458–59 (quoting *United States v. Smith*, 601 F.3d 530, 538 (6th Cir. 2010)). In making this determination, we consider five factors: "'(1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.'" *Id.* at 459 (quoting *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003)).

Applying these factors, we first conclude that the prosecutor elicited Detective Simpson's testimony. Second, though we find the prosecutor's questioning about the "drug investigations" to be troubling, his line of questioning was not unreasonable as a response to the cross-examination of the witness. Regarding the fourth factor, there was no need for the prosecutor to repeat Detective Simpson's testimony for emphasis, but this record does not support a determination that the

12

prosecutor acted in bad faith. Moreover, defense counsel's objection brought an end to the line of questioning, and the district court was not obligated to strike any of the preceding testimony or issue a curative instruction because no defense request was made. We find the fifth factor weighs heavily for the government because this portion of Detective Simpson's testimony was only a small part of the other ample evidence presented against Young. *See United States v. Forrest*, 17 F.3d 916, 921 (6th Cir. 1994).

Under these circumstances, we cannot say that the district court was faced with a "manifest necessity" requiring a mistrial. *See United States v. Cameron*, 953 F.2d 240, 244 (6th Cir. 1992). Young has not carried his high burden to establish plain error that affected his substantial rights and that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Thomas*, 11 F.3d at 630. We affirm on this issue.

## C. Jury instruction

### 1. Standard of review

Because Young did not object below to the instruction he now challenges on appeal, the plain error standard applies. *See Thomas*, 11 F.3d at 630. We review the jury instructions "as a whole in order to determine whether they fairly and adequately inform the jury of the relevant considerations and provide a sound explanation of the applicable law to aid the jury in reaching its decision." *United States v. Harrod*, 168 F.3d 887, 890 (6th Cir. 1999) (quoted case and internal quotation marks omitted). We will reverse a conviction based on an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial. *Id.* at 892.

13

## 2. *The court properly instructed the jury*

Young argues that the district court erred in giving Instruction Number 6, which was patterned after Sixth Circuit Pattern Criminal Jury Instruction 8.08. The instruction as read to the jury provided:

> Remember that the defendants are only on trial for the particular crime charged in the indictment. Your job is limited to deciding whether the government has proved the crime charged. Also remember that whether anyone else is prosecuted and convicted for this crime is not a proper matter for you to consider.
>
> The possible guilt of others is no defense to a criminal charge. Your job is to decide if the government has proved each defendant guilty. Do not let the possible guilt of others influence your decision in any way.

In *United States v. Larch*, 399 F. App'x 50, 55–56 (6th Cir. 2010), this court considered a version of this instruction given to a jury. The court acknowledged that the instruction could be misleading in cases where the defendant claimed that someone else committed the crime. *Id.* at 55. But as in *Larch*, the case before us was not about mistaken identity or alibi. Young argued to the jury that he did not conspire with anyone else to distribute drugs, not that he did not engage in drug transactions at all. Young repeats this refrain on appeal by contending that "these other individuals participated in drug transactions to an extent far greater than the circumstantial and innuendo evidence concerning Mr. Young." Appellant's Br. at 34.

The instruction appropriately advised the jury that its obligation was to "determine whether the evidence conclusively proved the defendant guilty of the charged offense and that it should not permit the possible *additional* criminal liability of others to influence its decision." *See Larch*, 399 F. App'x at 55. Under the facts of the case and in the context of the other instructions given, this instruction protected Young by preventing the jury from finding him guilty based solely on the criminal conduct of others. Young has not shown plain error.

14

**D. Sentencing enhancement**

*1. Standard of review*

"[A] failure to engage in the colloquy required by section 851(b) is subject to harmless error analysis." *United States v. Denkins*, 367 F.3d 537, 549 (6th Cir. 2004) (quoted case and internal quotation marks omitted). Under harmless error, the government has the burden to show that the alleged error did not affect Young's substantial rights. Because Young did not object below, however, the government correctly contends that this issue is subject to plain error review. *United States v. Craft*, 495 F.3d 259, 265 (6th Cir. 2007). Under plain error review, Young carries the burden to show that the alleged error affected his substantial rights. In any event, the standard to be applied does not impact the result because Young's substantial rights were not affected.

*2. Young made no attempt to challenge his prior convictions*

At the time of sentencing, the drug statute required a mandatory minimum sentence of life imprisonment because the offense involved 50 grams or more of crack cocaine and Young had been convicted previously of numerous felony drug trafficking offenses. 21 U.S.C. § 841(b)(1)(A). The government filed a sentencing enhancement information under 21 U.S.C. § 851 alleging eight prior felony drug convictions.

The statute imposes a duty on the district court, after conviction but before pronouncement of sentence, to inquire if the defendant affirms or denies the prior convictions alleged in the § 851 information. 21 U.S.C. § 851(b). The court must also advise the defendant that any objection not raised before sentence is imposed may not thereafter be raised to attack the sentence. *Id.* The district court did not follow this statutory procedure.

15

The § 851 information and the presentence report informed Young that he faced a mandatory life sentence as a result of his prior felony drug convictions, but Young did not make any effort to challenge those convictions. It appears that any challenge would have been barred by the statute of limitations because the convictions occurred in 1993, 1997 and 1999, and the § 851 information was filed in March 2010. *See* 21 U.S.C. § 851(e) (barring challenges to convictions occurring more than five years before the date of the information alleging the prior convictions). Therefore, we conclude, under harmless error or plain error review, that Young's substantial rights were not affected when the district court did not follow the statutory procedure.

Finally, Young asks us to review our precedent subjecting § 851 errors to harmless error review, citing *Denkins* and *United States v. Hill*, 142 F.3d 305, 313 (6th Cir. 1998). We cannot reach this issue, however, because one panel of the court may not overrule decisions issued by other panels. *United States v. Washington*, 127 F.3d 510, 517 (6th Cir. 1997).

## CONCLUSION

For all of the reasons stated, we AFFIRM Young's conviction for drug conspiracy and the statutory mandatory life sentence the district court imposed.

16